## PHILLIPS v. UNITED STATES.

No. 1536.

United States District Court,
E. D. Tennessee, N. D.

Jan. 23, 1952.

3. 182 F.2d at pages 331, 332.

W. P. O'Neil, Jennings, O'Neil & Jarvis and John J. Duncan, Knoxville, Tenn., for plaintiff.

Otto T. Ault, U. S. Dist. Atty., Ferdinand Powell, Jr., Asst. U. S. Dist. Atty., Knoxville, Tenn., for defendant.

ROBERT L. TAYLOR, District Judge.

This complaint was filed under the provisions of the Federal Tort Claims Act, Title 28 U.S.C.A. §§ 1346(b), 2401(b) and 2671 et seq.

Plaintiff, 39 years of age, and a resident of Scott county, Tennessee, on, or about November 29, 1948, went with her husband to Oak Ridge, intending to enter the reservation to investigate an automobile accident which occurred on the reservation and in which her son was involved. She and her husband stopped outside of the Elza gate and entered the pass office to obtain passes. She entered from the rear of the pass office, it being customary for patrons to enter either from the front or the rear. Mr. Phillips opened the door by the doorknob for Mrs. Phillips to enter before him. She stepped inside and seeing that the door was about to close on her husband, she reached out to hold the door open for him. Her husband has one leg amputated and walks on crutches. The upper part of the door was glass panelled and one of the panels was broken and jagged glass remained in the panel. When Mrs. Phillips reached to hold the door open her hand encountered the broken glass and was cut. The injury was to the palm of her hand, caused by the hand coming in contact with the particles of glass left in one of the panels of the door. Immediately after the injuries, C. C. McNabb an attorney for the Atomic Energy Commission in charge of claims, was called and went to the Elza gate and found the injured plaintiff had received first aid from one of the guards on duty. At the suggestion of Mr. McNabb further examination of the hand was made by Dr. Helm, a physician in the Oak Ridge Hospital, who sutured the hand and suggested that plaintiff return for further treatment in about five days. Further medical attention was administered by Dr. Helm when plaintiff returned at the end of five days, when stitches in her hand were removed. At that time the wound was infected. She did not return to Oak Ridge for further treatment by Dr. Helm but was treated by Dr. Milford Thompson, who lived near her home, and who took some glass out of the wound. Thereafter, beginning January 20, 1949, she was treated on fourteen occasions by Dr. Ausmus, who operates the Jellico Hospital, and after two curettements Dr. Ausmus, in the month of October, 1949, by surgical operation removed glass from her injured hand. At the time of this operation Dr. Ausmus was of the opinion that the wound would probably heal and that plaintiff would not be totally disabled in the use of her right hand According to Dr. Ausmus "the original site of the injury healed and got all right, apparently, and then between the elbow and the shoulder on her right arm hard areas developed, and she complained of severe pain. At that time I advised consultation, and we decided to make an appointment with Dr. Penn, and Dr. Penn saw her in December, 1949—December 28th. I believe." The fingers did not begin to draw until after treatment by Dr. Penn. The medical term describing her condition is tenositis. This is an infection of the tendons. She also has an arthritic condition in her arm, hand and shoulder. This is due to an infection. Her condition

is permanent and will grow progressively worse, according to Dr. Ausmus. He put the disability to her right arm and hand at one hundred per cent. Dr. Penn placed this disability between eighty-five and ninety per cent. In addition to the disability to her arm and hand, she also has some disability in her right shoulder. She suffers severe pain which has had a marked effect on her nervous system. This affliction and disability have extended to other portions of her body, making their appearance in the form of lumps in her breast and swollen glands in her neck. An examination of her fingers while on the witness stand disclosed that her little finger, ring finger and middle finger were severely drawn toward the palm of her hand—index finger less drawn than these three fingers named and her thumb less drawn than her index finger. The skin was tight on these fingers and had broken on two or more of them. The entire hand appeared to be swollen. Dr. Ausmus described this condition as a marked contracture—deformity of the right hand and with arthritic changes in the shoulder and general inability to use the arm. She also complained of marked induration of the muscles of the right side of the neck, and right pectoral region of her breast. He further described induration as "hardening of the tissues."

Mrs. Phillips stated that her condition had grown steadily worse; that she suffered considerable pain in the three years since the accident; that her right arm hurts all the time; that she has no use of her right hand; that there seems to be little hard places in her arm. She described the condition of her upper arm and shoulder— "awful painful in my shoulder, and all back there, and still in my neck and my glands are enlarging in my neck. My right breast is enlarged and I have lumps in it." She further stated that she was "awfully nervous."

The Government insists under its first defense that the complaint fails to state a claim on which relief can be granted.

This defense is untenable. The proof shows that the pass office was maintained by the Atomic Energy Commission, hereafter referred to as AEC, for use of the public—for persons having reasons, or desiring passes, to enter the Oak Ridge Reservation. The persons entering under such circumstances, as in plaintiff's case, were not trespassers, but were invitees. As heretofore shown, plaintiff had legitimate business on the reservation but she could only enter the reservation with a pass obtainable at the pass office. Plaintiff, accordingly, came within the group of persons for whom the pass office was maintained. Maintenance of the pass office in a safe condition was a positive duty upon the part of the AEC. Maintenance of this facility in a dangerous condition was an act of misfeasance upon the part of the AEC and the kind of tort for which a principal is liable under the rule of respondeat superior. Such was the holding of this Court in the case of Blaine v. United States, D.C., 102 F.Supp. 161.

Mr. Phillips stated that the representatives of the AEC at the pass office stated to him immediately following the accident that representatives of the AEC had been notified of the broken glass on October 26, 1948. This accident did not occur until November 29, 1948. The condition, accordingly had existed more than one month prior to the accident. Objection was made to the introduction of this proof by the Government and decision was reserved until disposition of the case on the merits. The Court now holds that the proof is competent, not as substantive evidence on the question of care or lack of care on the part of the AEC, but on the question of notice to the AEC of the defective condition of the door in question.

In addition to the above mentioned testimony on the question of notice, the answer of the Government contains the following: "Said broken glass panel had been discovered by the employees of the defendant working in said pass office several days prior to said date and had been reported for repair, but had not been replaced on said date."

The second defense of the Government is a general response to the complaint. What has been said, and will be said hereafter, is sufficient answer to this defense.

■ The Government contends in its third defense that if it was guilty of negligence as alleged in the complaint, plaintiff was guilty of contributory negligence in manipulating the door without exercise of due care, when she ought to have known of the dangerous condition of the door. The record shows that plaintiff had never entered the pass office prior to the date of her injury; that the weather was dark and gloomy on the day of her accident; that there were several small pieces of jagged splinters of glass in the broken panel; that her husband preceded her in the opening of the door and attempted to hold the door after it was open and in doing so, partially blocked her view of the door itself; that he was holding the door open with his right crutch and, as it was closing against the crutch, it appeared to her that it would upset him. It was in this situation that she, in protecting her husband and aiding him to enter the building, did the natural thing in placing her hand upon the door. This was a result which the defendant should have reasonably foreseen.

Under the circumstances, the Court is of the opinion, and so finds that she was free of any negligence which proximately contributed to the accident and resulting injuries.

In the fourth defense the Government insists that plaintiff's husband was required to bear the cost and expense of her care and treatment, and that he was reimbursed for such expenses after filing his claim for damage with the AEC on November 10, 1949. This claim is filed as Exhibit No. 9 in the record and shows that the amount of the claim is $779.65. There is no dispute about this amount having been paid to plaintiff's husband subsequent to November 10, 1949. The claim shows on its face that the amount claimed included medical expense of Mrs. Phillips as of January 31, 1950. It is also stated on the claim that "all future medical expenses are to be paid by Mrs. Phillips."

[5] The Court is of the opinion and holds that this claim does not bar plaintiff from recovering medical expense which she obligated herself to pay for the injuries in question subsequent to January 31, 1950. Under the Married Women's Emancipation Act, Tenn.Code sec. 8460, married women were given the right "to sue and be sued with all the rights and incidents thereof, as if she were not married." This Act also gives them the right to contract with respect to their own property, real and personal. Under this same Section they are also given the right to sue for personal injuries without the joinder of their husbands. Knoxville Railway & Light Co. v. Vangilder, 132 Tenn. 487, 499, 500, 178 S.W. 1117, L.R.A.1916A, 1111. Where a husband is unable financially to pay for the medical care and funeral expenses thereof, the wife's separate estate is liable therefor. Simpson v. Drake, 150 Tenn. 84, 262 S.W. 41. A few states have held that under emancipation statutes a wife, having full power to contract as if she were single, may recover expenses actually paid or incurred by her on account of her personal injuries. Thibeault v. Poole, 283 Mass. 480, 186 N.E. 632; Fink v. Baer, 180 Minn. 433, 230 N.W. 888; Muskogee Electric Traction Co. v. Green, 91 Okl. 200, 217 P. 155. The Tennessee courts have followed the same general principle, by holding that a wife has a right to contract and bind herself personally, as if she were a feme sole. Morton v. State, 141 Tenn. 357, 209 S.W. 644, 4 A.L.R. 264; Jefferson County Bank v. Hale, 152 Tenn. 648, 280 S.W. 408.

■ In the fifth defense the Government asserts that plaintiff, acting through her husband, made claim against the defendant for her care and treatment and in her agreement with defendant the defendant paid the costs and expenses of the plaintiff's care and treatment, and that the plaintiff has heretofore split her cause of action and is barred and precluded from maintaining this action. The settlement on its face shows that it was partial only and limited to the period up to and including January 31, 1950, and does not purport to be a full settlement for medical care and treatments. The claim is somewhat analogous to an argument that part payment of a debt bars an action to collect the balance, a result which has no sanction in our law.

Splitting of a cause of action does not operate prospectively. It operates as an estoppel after judgment. Where a plaintiff, having a cause of action, elects to recover on only a part of it, a judgment thereon is res judicata against a second suit to recover on another part (provided the right to recover on all had accrued at the time of the first suit). Splitting of a cause of action is not fatal to the first action, but only to the second. In modern times the defense is in the nature of the plea of res judicata. Northern Pacific Ry. Co. v. Slaght, 205 U.S. 122, 27 S.Ct. 442, 51 L.Ed. 738; Deweese v. Smith, 8 Cir., 106 F. 438, 66 L.R.A. 971.

Finally, the Government insists that plaintiff in filing the claim of $1,000 on November 10, 1949, shown in Exhibit No. 5, although withdrawn by her in letter of October 24, 1950, Exhibit No. 6, precludes her from a recovery in excess of that amount for the reason that there is no newly discovered evidence not reasonably discoverable at the time of the presentation of the claim to the AEC and there is no allegation and proof of intervening facts relating to the amount of the claim within the meaning of the applicable statute. This defense was specially called to the attention of the Court for the first time when the case was tried on its merits on December 18, 1951. An extended pretrial conference was held in the case on June 29, 1951, but no specific mention was made of this defense. After the conclusion of the proof, the Assistant United States District Attorney in his argument specifically stressed the defense for the first time. Apparently, this prompted the attorneys for plaintiff to move for permission to amend the complaint under Rule 15, 28 U.S.C.A., which motion was reduced to writing and filed on January 4, 1952. On the same date an order was entered allowing the amendment. The amendment in substance alleges newly discovered evidence by plaintiff not reasonably discoverable by her at the time she presented her $1,000 claim; also, intervening facts relating to the amount of the claim. Title 28, U.S.C.A. § 2675 provides in part as follows: "(b) The claimant, however, may, upon fifteen days written notice, withdraw such claim from consideration of the federal agency and commence action thereon. Action under this section shall not be instituted for any sum in excess of the amount of the claim presented to the federal agency, *except where the increased amount is based upon newly discovered evidence not reasonably discoverable at the time of presenting the claim to the federal agency, or upon allegation and proof of intervening facts, relating to the amount of the claim.*" (Emphasis supplied.)

Plaintiff testified to the effect that Mr. McNabb, attorney for the AEC with whom she was dealing—she did not have an attorney at that time—told her in substance that if her damages exceeded $1,000 her claim could be withdrawn and never be shown. The Court was impressed with the fairness displayed by Mr. McNabb in dealing with plaintiff from the inception of her injuries. Either he or his associate, Mr. Ferguson, on one occasion and perhaps others, advised her that they thought it would be better for her to employ her own attorney. At the time she signed her claim with the AEC, it appeared that the infection in her hand had been checked. Her fingers had not then commenced to contract. This is borne out by the testimony of Dr. Ausmus as follows:

"Q. But at the time that you incised the wound it hadn't commenced to draw? A. No; that's right."

She was operated on by Dr. Ausmus in October, 1949. At that time there was no indication of an arthritic condition in her hand and arm. Dr. Ausmus thought the hand would heal after the operation. He did not think at that time that she would be totally disabled in the hand. After the operation, as shown hereinbefore, the original site of the injury healed all right, but severe pain developed in the elbow and shoulder. This prompted Dr. Ausmus to call in Dr. Penn for consultation. Dr. Penn was called in on December 27, 1949. This was 47 days after she filed her $1,000 claim with the AEC. Her fingers began to draw after she submitted herself to the

care of Dr. Penn, that is, sometime after December 27, 1949, according to Dr. Ausmus.

"Q. Now, when did her small finger commence to draw? A. That started to draw while she was under the care of Dr. Penn; I can't give you that.

"Q. But at the time that you incised the wound it hadn't commenced to draw? A. No; that's right."

Mrs. Phillips stated that she went to see Dr. Penn because of the severity of pain in her shoulder, neck, breast, and up her arm and hand. Dr. Penn put her in Fort Sanders Hospital where she remained for eight days. It has been observed that the drawing of plaintiff's fingers commenced 47 days after she had filed her claim. It is also true that the hardening process described by Dr. Ausmus as induration became noticeably accelerated after she placed herself under Dr. Penn, or after her fingers began to draw. This induration also progressed through her arm and appeared in her neck. This drawing of the fingers, as a result of the affliction called induration, could not reasonably have been discovered before the filing of the claim for the reason that the drawing had not commenced, or manifested itself until after 47 days. Neither could the severe pains in the shoulder, neck, breast, arm and hand have been discovered at, or prior to, the time she filed her claim with the AEC for the reason that they had not manifested themselves with such severity until shortly before the time she submitted herself for treatment to Dr. Penn. This final defense of the Government is untenable for the reason that evidence of the serious condition and progressive development of the plaintiff's affliction was discovered after she had filed her claim and could not reasonably have been discovered prior thereto. This situation constitutes the proof of intervening facts required by sub-section 2675(b) as a prerequisite for withdrawing her claim and suing for the amount in excess of the $1,000 which she had claimed.

This brings us to the question of the amount of damages which is always a difficult question for this Court in personal injury cases. This case is no exception. It is reasonably clear to the Court that this case started out to be what the interested parties thought was a minor injury. Even on the date of Dr. Ausmus' operation, which was almost one year subsequent to the accident, it was believed that there would be no permanent disability. The circumstances which prompted Dr. Ausmus to call in Dr. Penn put a different complexion on the injuries. At that time they were apparently getting much more severe. The Court is convinced from what he observed of plaintiff's condition on the witness stand that her right arm, including the whole of her right hand, is in a serious condition. The proof indicates strongly that this infectious condition is spreading to her breast, right shoulder, and possibly to her neck and back. As to where it will end, the Court is unable to say. As previously stated, at the time of the injury she was 39 years of age and apparently in good health. She did neighborhood sewing from which she eked an estimated net profit of $150 per year. This is minor damage as compared with the pain and suffering which she has undergone for the past three years with no alleviation in sight. In addition to the pain and suffering, she is disfigured, with a right arm that is of no, or very little, use. She is disfigured by having a drawn hand and disabled arm. She is unable to engage in customary activities of a woman in her own home, such as sewing, milking, gardening, and the numerous other activities in which a woman finds pleasure. The following statement in the testimony of her husband suggests the extent to which life has become for her, more or less of a nightmare of continual suffering: "She complains of pain practically all the time. She wakes me up of a night, turning and twisting and complaining of her head and her neck and shoulder and her hand and fingers are hurting. She just doesn't rest good of a night at all."

The Court is of the opinion that plaintiff is entitled to $15,000.

Let an order be prepared accordingly.