10917. CITY OF SANDERSVILLE *v.* MOYE.

1. A cause of action against the city was stated by the petition as amended, from which it appeared that the plaintiff's minor son, when riding a bicycle on a sidewalk near the entrance of public-school grounds, was killed by electricity on coming in contact with an electric-light post charged with the current from wires insufficiently insulated, which it was alleged had been allowed to remain in that condition an unreasonable length of time. The trial judge did not err in overruling the general and special demurrers to the petition.

2. The excerpts from the charge of the court which are complained of contain correct statements of law applicable to the case; and if any further or additional instructions were desired, the trial judge should have been presented with appropriate written requests so to charge.

3. The failure of the court to give certain instructions to the jury, as complained of in the motion for a new trial, is not cause for a new trial, as there was no appropriate written request for such instructions, and, in the charge of the court all the substantial issues in the case were fully and fairly submitted to the jury, with the law applicable thereto.

4. The court did not err in admitting the testimony of W. M. Goodman, counsel for the defendant, and in permitting counsel for the plaintiff to examine into the qualifications of jurors about to try the case. The note of the judge in approving the motion for a new trial clearly and fully explains the matter and shows that upon an examination as to the qualifications of the jurors, some of them were found to be disqualified.

5. The evidence, while conflicting, was sufficient to authorize the verdict, and the court did not err in overruling the motion for a new trial.

DECIDED MARCH 11, 1920.

Action for damages; from city court of Sandersville — Judge Jordan. August 6, 1919.

Headnote 4 relates to a ground of the motion for a new trial in which it is alleged that the court erred in calling to the stand W. M. Goodwin, counsel for the defendant, and requiring him to testify in the presence of the jury to the effect that the United States Fidelity & Guaranty Company was interested in the defense of this case, and had aided in the employment of counsel for the defense; "the error being that the minds of the jury were improperly affected by such conduct on the part of the court as to who the true defendant was, and a further error being that if the facts elicited from said counsel . . were true, it was improper to have the same appear from the testimony of counsel representing the defendant." As to this ground the trial judge, in a note to the motion for a new trial, says: "When the case was sounded for trial, counsel for plaintiff asked counsel for the defendant whom they represented, the reply being they represented the City of Sandersville; whereupon counsel for plaintiff asked counsel for defendant by whom they were employed, intimating that a bond company or surety company was the real client. The court sent the jury out, as the court wished to exclude from the jury the fact that the City of Sandersville had a bond in a surety company protecting them from liability. The proposition then came up as to purging the jury of all disqualified jurors, counsel for plaintiff insisting that in order to obtain a qualified jury it was necessary to ascertain if any jurors were stockholders, employees or relatives of stockholders in the bond company. The court then ordered the jurors that had been sent out to return to the court-room. At this juncture counsel for defendant made the point that it did not appear to the court that any parties were interested in the case except the plaintiff and the defendant (the court knew by rumor only that the United States Fidelity & Guaranty Company had by a bond indemnified the City of Sandersville from liability such as the suit sought to establish), and still objected to the court propounding any questions to the jury to ascertain if there were stockholders or relatives of stockholders of this party on the jury; whereupon counsel for plaintiff offered to prove, and called W. M. Goodwin and did prove, that the United States Fidelity & Guaranty Company had written a bond to in-

demnify the defendant from liability against injuries inflicted by its lighting plant or electric wires. This evidence was brought out for the sole purpose of making it appear to the court legally and by evidence that the United States Fidelity & Guaranty Company was interested, in order for the court to ascertain by inquiry from the jurors in court that they were disqualified to sit on the case. The court called over a list of resident stockholders in this company, and purged the jury of all relatives, some of whom disqualified, is the recollection of the court, as well as all stockholders. The jury, at the instance of the defendant, was put upon the voir dire, and the parties thus exercised their privilege of striking. No challenge of any kind was made to the qualifications of the jurors, nor was any objection made at the time to the evidence of Mr. Goodwin being delivered in the presence of the jury. From inquiry made from the jurors since the trial, three state that the testimony of Mr. Goodwin was not delivered in their presence, while one states that he heard Mr. Goodwin testify."

*W. M. Goodwin, J. E. Hyman, Rawlings & Wood, Ryals & Anderson,* for plaintiff in error.

*A. R. Wright, J. J. Harris,* contra.

SMITH, J. S. M. Moye brought suit against the City of Sandersville to recover damages for the homicide of his minor son, alleging that the deceased, while riding a bicycle upon one of the sidewalks of said municipality, came to his death by reason of coming in contact with an electric-light post, commonly known as a "white-way" post, which post was located at the entrance of the public-school grounds, immediately adjacent to the sidewalk, and that it was an improper instrumentality to support electric wires charged with approximately 2300 volts; that the wires were insufficiently insulated, the insulation thereon being old and worn and inadequate to prevent the passage of the dangerous current therefrom in the event any person or thing came in contact therewith; that the defendant was negligent in stringing along the public highway, and over grounds where the public was invited to be, at a height of between 10 and 11 feet only, wires charged with the high voltage referred to; that the defendant permitted a "ground" to continue in its system an unreasonable length of time, without detecting or curing the same, and that it was also negligent in failing and refusing to cut off its current for an

unreasonable length of time after notice that the deceased was in contact therewith. We will briefly state the evidence supporting each of these several alleged acts of negligence and the law applicable thereto.

The following evidence will suffice to indicate whether or not the defendant had knowledge of the defective condition of the post: "Mr. Porter (superintendent of the city's electric plant) reported to the council that this was a defective post. . . He made this report in the council-room, at the time the city council were present. . . He advised the removal of those posts, and that he did not consider them safe. . . That was some months previous to the death of young Mr. Moye." Another witness testified to the same effect and import in the following language: "My understanding is that he (Mr. Porter) reported we had a post there charged with electricity at the time, and that it was dangerous." Still another witness testified that he erected the post, and at the time it was being put up he protested to Mr. Porter against the manner in which it was erected and told him that it was dangerous. Having, therefore, actual knowledge of the defective condition of this post, which was located on the premises of a public school, a place where children were continually at play, the law required the defendant to cease sending its current through the wires strung thereto until the same was repaired. *Atlanta Consolidated Street Ry. Co.* v. *Owings,* 97 *Ga.* 663 (1) (25 S. E. 377, 33 L. R. A. 798).

The allegation that the wires attached to the defective post conveyed an unnecessarily high and dangerous electric current, and that an innocuous current could have been used, was supported by the evidence of the witnesses Harrison and Eager. The former testified that "by using the transformer, that current there could have been reduced to 110. . and not have been dangerous at all. I directed Mr. Porter's attention to that fact at the time. He directed me to carry it on with the regular voltage." The latter testified, "there is no danger in 110 voltage unless some other contact is made." This statement was corroborated by another witness, an electrical engineer, who testified that a current of 110 volts was harmless. The defendant company having elected to use an extremely powerful and dangerous and unnecessary current, it should have used a "transformer," or other known and

approved appliance to reduce the current to a safe voltage. In *Heidt* v. *Southern Bell Telephone Co.,* 122 *Ga.* 474-478 (50 S. E. 361), it was said by Evans, J.: "Persons or companies operating telephone and electric-light systems for the transmission of electricity upon and over public highways owe to the public the duty of properly constructing and maintaining their respective wires and poles; they are bound to provide such safeguards against danger as are best known and most extensively used, and all necessary protection must be afforded to avoid casualties which may be reasonably expected." See also, in this connection, *Higgins* v. *Cherokee Railroad,* 73 *Ga.* 149; *Davis* v. *Augusta Factory,* 92 *Ga.* 712 (18 S. E. 974); *Columbus Railroad Co.* v. *Kitchens,* 142 *Ga.* 677, 679 (83 S. E. 529, L. R. A. 1915C, 570).

The evidence as to the alleged negligence of the defendant in insufficiently and improperly grounding the post was as follows: "The effect of a permanent ground is to keep the current going into the ground. Then the post would not be dangerous; it would carry it into the ground. By that means you can render it harmless. . . The effect of a permanent ground is to carry the current in the ground. No effort was made to put a ground of this character there. . . It could have been done by running the wires down seven or eight feet, depending upon the depth of the moisture. That would have rendered the post not dangerous, if they had done that." There was positive evidence that this post was insufficiently grounded, since a witness testified that he had, prior to the death of plaintiff's son, received a shock from the post without coming in contact therewith. The law imposed upon the defendant, who was using the public highway for electric wires carrying a powerful and dangerous current, "a very high degree" of care in the *construction, use,* and *repair* of the post in question. *Southern Bell Telephone Co.* v. *Davis,* 12 *Ga. App.* 34 (76 S. E. 786); *Eining* v. *Georgia Ry. Co.,* 133 *Ga.* 458, 461 (1, 2) (66 S. E. 237).

The testimony with reference to the negligence charged against the defendant in not sufficiently and properly insulating its wires, so as to prevent the escape of the current therefrom should any person or thing come into contact therewith, was in part as follows: "It would have been best to have constructed this post there with insulation that would prohibit the escape of current

from those wires. That kind of wire was not used there. These were old wires they had there." In the case of *Trammell* v. *Columbus Railroad Co.*, 9 *Ga. App.* 98 (3) (70 S. E. 892), this court, in referring to the duty of insulating wires, said: "An electric-light company, engaged in conveying electricity by overhead wires over the streets of a city, is under the duty of keeping its wires so insulated as at all times to prevent, or at least to safeguard against, the effect of objects coming in contact with them, regardless of the cause which brings about the contact."

To sustain his ground of negligence that the defendant wilfully refused to shut off its current after notice that the deceased was in contact with the post, thereby permitting the current to pass through him for a period of 8 to 10 minutes, the plaintiff introduced the following evidence: "I knew Phil Moye. He is dead now. I don't remember the date he died. I remember the occasion. I was going home. It was after dark and drizzling rain. Just as I crossed down there, right at the depot, I met a negro. I suppose that was 125 yards from the place where he was killed. I met this negro coming from that direction running; he came running from the direction where I found Phil Moye. After meeting that negro I went on up to the place where Phil Moye was killed. I ran on up there and I saw Phil lying on the sidewalk on his back. . . I ran into preacher Kerr's house and telephoned the power-house and told them what had occurred, and to turn off the current. . I waited until I thought they had time to turn the current off, and it didn't go off, and I went back and called Mr. Porter's house. . Mr. Porter came to the phone and I told him what had occurred and he got there almost by the time the lights were cut off. . . I suppose it was six, seven, or eight minutes. I called up the power-house and told them to cut it off; . . that current was going through his body all of this time." "The duty of shutting off the current when necessary involves the duty of having a person at the power plant competent to turn off the current. If search discloses that there is no one at the plant with authority to do so, the company will be charged with injuries resulting from the continuance of the electric current." Curtis on the Law of Electricity, pp. 713, 714. Clearly, therefore, when we view the above facts in connection with the duty placed upon the defendant by rules of

law, we are precluded from holding that the verdict was without evidence to support it and contrary to law.

It is true that there was evidence introduced in behalf of the defendant to the effect that about 10 days before the homicide, the deceased threw a metal hoop over the top of this white-way post, which hoop rested both upon the wires on either side of the post and the post itself; and it is upon this proof that the defendant sought to avoid the consequences of its negligence, contending, of course, that the intervening agency of the hoop brought into play by the deceased was the proximate cause of the tragedy. The proximate cause of the death in this case was, as we view the facts developed upon the trial, peculiarly a question for solution by the jury. They, no doubt, rejected the defendant's contention that the intervening agency of the hoop, thrown over the post by the deceased, was the proximate cause of his death, on the idea that this act would have been without dangerous effect but for the antecedent negligence of the defendant in improperly grounding the post, and in conveying an unnecessarily high and dangerous current through the insufficiently insulated wires strung thereto, for they had before them the testimony of an expert who said that if this "same hoop had been thrown over a single one of these lights out here on the public highway, and a man had come in contact with it in that manner, there would not have been the slightest danger. The difference in that post and these posts is in the voltage, there is also a difference in the method of construction. Even if the hoop had been up there like Judge Rawlings said, if that post had been constructed like the white-way posts, and this boy [the deceased] had lifted it up and got hold of it, he would not have been hurt."

The defendant sought also to avoid liability on the ground that the deceased was a trespasser, it being contended that on the night of the homicide he tried to climb the post to remove the hoop, and in this manner met his death. The jury were amply warranted in not agreeing with the defendant in this particular, for the only eye-witness to the tragedy testified that he saw the deceased, who was riding a bicycle, enter upon the sidewalk, and that when the deceased came opposite the post he fell from his machine. This witness further testified that he attempted to pick the boy up, but was himself knocked down by the current. An-

other witness testified in this connection, that when he reached the scene of the homicide the boy was lying across his bicycle on the sidewalk, with his head towards the center of the street and his right foot across the cement curb, with the heel of his shoe against the post, and that there was an arc between the post and the heel.

What is hereinbefore said deals only with the general grounds of the motion for a new trial, since the other questions presented for review are sufficiently ruled upon in the headnotes.

*Judgment affirmed. Jenkins, P. J., and Stephens, J., concur.*