**Marvin R. RAY, Appellant,**

v.

**UNITED STATES of America,
Appellee.**

**No. 15601.**

United States Court of Appeals
Fifth Circuit.

Dec. 23, 1955.

Rehearing Denied Jan. 20, 1956.

R. Beverly Irwin, Atlanta, Ga., for appellant.

Marcus A. Rowden, Attorney, Dept. of Justice, Washington, D. C., James W. Dorsey, U. S. Atty., Chas. D. Read, Jr., Asst. U. S. Atty., Atlanta, Ga., Paul A. Sweeney, Dept. of Justice, Washington, D. C., Geo. S. Leonard, Acting Asst. Atty. Gen., for appellee.

Before HUTCHESON, Chief Judge, and TUTTLE and BROWN, Circuit Judges.

TUTTLE, Circuit Judge.

Appellant, Marvin R. Ray, brought this action against the United States under the Federal Tort Claims Act, 28 U. S.C. 1346(b), to recover for injuries sustained by him as the result of an explosion of high voltage electrical cables in a

Government-owned aircraft factory, leased and operated at the time of the explosion by the Lockheed Aircraft Corporation. It was alleged that the explosion was the result of the negligent and improper manner in which the cables were installed and the Government's failure properly to inspect the cables and maintain the buildings. On February 8, 1955, the United States District Court for the Northern District of Georgia, Atlanta Division, after a trial on the merits, entered judgment for the Government. The relevant facts may be summarized as follows:

In 1942, the United States undertook to construct an aircraft assembly plant at Marietta, Georgia. For the construction of this plant, it entered into a contract with Robert and Company, Associates, of Atlanta, Georgia, for architectural, engineering, and construction management services. The contracts for the actual construction work were, in the main, prime contracts entered into between the Government and various contractors. Aside from performing certain architectural and engineering services and aiding in the procurement of materials and equipment, it was Robert and Company's principal function to coordinate and supervise the various phases of construction performed by the individual prime contractors and ascertain that the work met appropriate specifications and contract requirements. It was provided in the Robert and Company contract that the facilities being constructed were to be operated by the Bell Aircraft Corporation upon completion.

In connection with the construction of this aircraft factory, a network of high voltage cables were installed through the area of the project to convey to the various parts of the assembly plant the electrical current necessary to power the various machines and provide illumination. Many of these cables were underground and led from the source of power, a Georgia Power Company substation, to various substations of the aircraft plant. The cables were furnished by the Habirshaw Cable and Wire Division of the Phelps Dodge Copper Products Corporation and were installed by the Broadway Maintenance Corporation under a prime contract with the Government.

Upon completion of the construction of the aircraft production facilities early in 1943, they were turned over to Bell Aircraft pursuant to the latter's contract with the Government. Upon Bell's assumption of the premises, operation of the plant was commenced and operations continued until the end of the war in 1945. In July, 1946, Bell's contract with the Government was terminated and the plant turned over to the Air Force which maintained the plant in a deactivated state until 1947. At that time, the plant was leased to the Allied Packaging Company, which operated it until sometime in 1949 when the Government reassumed possession and turned the management of the facilities, again deactivated, over to the Tumpane Company.

On January 5, 1951, the United States, through the Air Materiel Command, entered into a contract with the Lockheed Aircraft Corporation for the renovation and mass production of certain types of military aircraft. Lockheed's obligation to complete performance was made contingent upon the Government's furnishing, under a separate facilities contract, the plant in question. The contemplated facilities contract was entered into on January 19, 1951. It permitted Lockheed to use the installation on a no-charge basis and provided that the facilities were furnished without any warranty, express or implied, on the Government's part as to serviceability or fitness for use, but was subject to the right of Lockheed to inspect and reject the same. The premises were accepted by Lockheed and operation of the plant commenced in March, 1951.

About 7:00 A.M., on December 4, 1951, appellant Ray, an employee of Lockheed engaged in engine assembly work, entered the aircraft plant for the purpose

of reporting for work. He entered through Tunnel No. 4 of the plant and walked along this tunnel until he reached Tunnel No. 5, a crosstunnel in Building B-1. He turned left into this crosstunnel and had reached a point abreast of the door to Substation 2, which housed electrical facilities, when an explosion occurred in the manhole of Substation No. 2. The force of this explosion knocked Ray unconscious and when found immediately after the explosion he was in a stunned condition against the wall opposite the door to Substation No. 2. He was given preliminary aid at the plant and was thereafter removed to a local hospital for treatment. The explosion occurred on a Tuesday; by the following Monday, Ray was able to report back to Lockheed for work and continued his employment there, his duties being limited in conformity with his injuries. In April of 1952, Ray underwent surgery in which two of the nerves in the cervical spine were separated and during the years 1952–1955, received intermittent medical treatment for injuries to the cervical spine and nerves. During almost all of this period Ray continued his work at Lockheed and was working there at the time of this suit although the work was more restricted than prior to the explosion. Subsequent to the accident, Ray received compensation under the Georgia Workmen's Compensation Act, Code, § 114–101 et seq., for the injuries incurred as the result of the explosion. The evidence authorized a finding that he had received some degree of permanent injury.

It appears that the cables themselves used in the installation were of first quality. However, it was necessary to make a substantial number of splices since the cables were not long enough in all cases. When the installation work was completed Robert and Company's inspection ascertained that certain potential heads insulating the cables' terminals had not been properly filled with insulating material. By agreement with the contractor this dispute was resolved by arbitration.[1]

Mr. Paul Boyd of the Georgia Power Company was thereafter called in to inspect the potential heads and resolve the controversy. He performed the inspection, determined that the potential heads had not been properly filled with insulating compound and required Broadway to correct the defect. This correction was accomplished. At the same time the above inspection was effected, Boyd inspected two splices, found that these splices were not properly filled with insulating compound and reported this fact to Robert and Company. The court found that it did not appear where the splices were located, whether the insufficiency of compound in those splices was corrected or whether this defect was present in more than two of the splices, but that Robert and Company inspectors had approved the completed installation.

Before being placed in operation the entire system was subjected only to visual inspection and what is known as the "mega" test.[2]

The specifications under which the contract was performed called for a high potential test.[3] The Government did not require a high potential test prior to acceptance of the installation.

There was ample evidence to warrant the finding of the trial court that "it is the best, accepted practice upon the completion of a new electrical installation such as the one here involved, that just before the same is accepted and put into

---

1. The potential head is the point where the cable terminates. The head is insulated and sealed and has terminals that may be connected to transformers or other equipment.

2. The "mega" test measures the resistance of the installed system and tests to insure that there is no grounding or short circuiting.

3. The high potential test involves the introduction into the electrical system of an electrical load at least double that which it will normally be expected to carry. The normal load in this situation was approximately 12,000 volts.

actual use that it be tested by what is known as a high potential test."

During the first two years of operation by Bell there was one explosion of a splice, and there were one or two short circuits which did not result in an explosion. There was a further explosion or fault of a splice in 1947 in a part of the circuit that had been de-energized. Neither of these faults related to the particular splice which was in the manhole which exploded on the occasion of plaintiff's injury. The circuit of which this splice formed a part had been energized before the plant went into operation in 1943, and had continued in an energized state down to the time of the accident. The full load of electrical current had been applied to it during the Bell operation of some two and one-half years and subsequently during the Lockheed operation from March until December, 1951. There was no visible or apparent defect in the splice here involved, and the court found that it was impossible to conclude with any degree of accuracy the exact cause of the explosion, although both parties discussed the merits of the case upon the assumption that there was a failure in the splice causing a short cir-

cuit. There was testimony to the effect that the explosion could have been caused by deterioration of the cables themselves or by deterioration of the insulating material protecting the splice.

Plaintiff's right to recover depends upon the provisions of the Federal Tort Claims Act.[4] The Government contends that under this law there is no liability on the Government unless the act or omission which injures the plaintiff is one which would make liable some agent or employee of the Government for whose acts it is held accountable under the doctrine respondeat superior. Numerous cases are cited for this proposition, including, from this court, United States v. Campbell, 5 Cir., 172 F.2d 500, at page 503 where Chief Judge Hutcheson, speaking for the court, said:

> "The whole structure and content of the Federal Tort Claims Act makes it crystal clear that in enacting it and thus subjecting the Government to suit in tort, the Congress was undertaking with the greatest precision to measure and limit the liability of the Government, under the doctrine of respondeat superior * * *."

4. The relevant provisions of the Tort Claims Act provide as follows:
28 U.S.C.A. § 1346(b).

"Subject to the provisions of chapter 171 of this title, the district courts, together with the District Court for the Territory of Alaska, the United States District Court for the District of the Canal Zone and the District Court of the Virgin Islands, shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."
28 U.S.C.A. § 2671:

"As used in this chapter and sections

1346(b) and 2401(b) of this title, the term—

" 'Federal agency' includes the executive departments and independent establishment of the United States, and corporations primarily acting as, instrumentalities or agencies of the United States but does not include any contractor with the United States.

" 'Employee of the government' includes officers or employees of any federal agency, members of the military or naval forces of the United States, and persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation."
28 U.S.C.A. § 2674:

"The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages."

See also Hubsch v. United States, 5 Cir., 174 F.2d 7, and Goodwill Industries of El Paso v. United States, 5 Cir., 218 F.2d 270. Appellant rejects this contention and asserts that the Government is liable to a third party in all cases in which an individual would be liable, without reference to the suability of the agent or employee.

■ We shall proceed to a consideration of this case, however, without at this time passing on this question, for unless actionable wrong is shown under the applicable state laws, the plaintiff cannot recover even though the statute's application is not strictly confined to the respondeat superior theory of liability. The plaintiff here bases its claim for damages on allegations that the Government was negligent in six respects: (1) in not taking down and reconstructing all electrical connections after it learned of deficiencies therein from Boyd and (2) in allowing the electrical system to be placed in use without first subjecting it to a high potential test; (3) in not taking down and reconstructing the electrical connections after it learned of explosions in the splices and (4) in failing to subject the electrical system to the high potential test after it learned of these explosions; (5) in permitting the electrical system to be used when it knew or ought to have known that it might explode and (6) in failing to warn Ray of the danger of exploding cables.

It will be observed that these alleged acts of negligence took place during three time periods: the first two during construction of the plant in 1942 and before it was turned over to Bell in early 1943; (3) and (4) after explosions had occurred, in 1944 and 1947; and (5) and (6) thereafter and up to the date of the explosion, on December 4, 1951.

■ The United States denied the acts of negligence asserted and thus put on the plaintiff the burden of proving that in at least one respect negligence of, or imputable to, the Government was a cause of the unfortunate accident.[5]

■ The Government itself did not construct the facility but had this done by an independent contractor. It would, therefore, be liable for injury to plaintiff from faulty construction or from failure to subject the work to a proper test before operation only if such faulty construction or failure to test constituted negligence as to this plaintiff, and only if the negligence of the contractor is to be imputed to the Government as owner and if such negligence had a causal connection with the injury.

■ First, as to faulty construction: The only evidence as to this was the fact of the explosion, plus the inferences which the plaintiff says should be drawn from the fact that certain other electrical installations known as potential heads and two splices, other than the one here in question, had been defectively installed. The court held that even if there had been faulty construction of the particular splice, that was not the cause of this explosion, because several witnesses testified that faulty construction of the splice would have caused a fault or failure within a period much shorter than the seven or eight years that had elapsed. Although the court did find that it was the accepted practice that an installa-

5. There is no question of exemption from the act on the ground that the waiving of the high potential test was a "discretionary act" by the War Department. Such defense was not urged by the Government under the provisions of 28 U.S. C.A. § 2680, which provides: "The provisions of this chapter and section 1346 (b) of this title shall not apply to—

"(a) Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused. * * *" For the application of this doctrine see In re Texas City Disaster Litigation, 5 Cir., 197 F.2d 771, affirmed Dalehite v. United States, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427.

tion such as this be tested by a high potential test before being put into use, this finding could not amount to a finding of causal negligence because the court in effect held that even if such a test had been made, this particular splice would have passed the test, since the court found that had there been a defect in the splice it would have faulted long before December, 1951. This finding of the court is amply supported in the record and cannot be· set aside by us as clearly erroneous.

Thus, it is not necessary for us to consider whether the Government's failure to require the high potential test, even if negligent, is the kind of act or omission which, under the Georgia law, would be attributable to the Government either under the theory of landlord liability [6] or under the theory of nondelegable duty in the employment of another to perform an inherently dangerous act.[7]

If, in other words, it should be held, as we do not, that the Tort Claims Act imposes on the Government the same liability as a landlord with reference to defective construction or as an employer in engaging a contractor to perform an inherently dangerous task, the court's finding on this branch of the case would acquit the Government, because it amounts to a finding that there was no defect in construction and that the contractor was not negligent.

■■ Next, as to the duty of the Government as to proper maintenance or reconstruction after certain faults in other parts of the system had been experienced: Having found, as it did, that this splice was not defectively constructed, what did the trial court have before it upon which it was required to, or even permitted to, find a duty on the Government, as owner of the property, to make a particular radical test of this splice or take it down for the purpose of inspection? The plaintiff points to two explosions in splices, one of which occurred within two years after construction and approximately six years before the accident here complained of, and the other of which occurred under conditions of unusual significance. The plaintiff says that since other splices had faulted the court should infer that the particular splice here in question had become defective and should find that the Government was put on notice of this defective condition by reason of the earlier faults, and that it thereupon became liable to the plaintiff for failing to keep the premises in repair under the Georgia statutory requirement.[8]

This liability, however, is not absolute. It arises only if the landlord has knowledge of the defect or sufficient facts to impute knowledge and a reasonable opportunity to repair.[9] The inference, which the plaintiff says the court was required to draw, that the faults in other splices amounted to notice to the Government of a fault in this splice, is hardly a permissible one, much less one which the court, as the finder of fact, was required to draw. This is particularly true in light of the court's finding, above referred to, that this particular splice was not made defectively. The record does not clearly show how many such splices there were in all. We know there were many, since there were several in each of the several manholes. It is farfetched indeed to contend that the court

---

6. Section 61–112, Code of Georgia, provides as follows: "Liability of landlord for negligence of tenant and for failure to repair.—The landlord, having fully parted with possession and right of possession, is not responsible to third persons for damages resulting from the negligence or illegal use of the premises by the tenant; but he is responsible to others for damages arising from defective construction or for damages from failure to keep the premises in repair."

7. Section 105–502, Code of Georgia, provides as follows in pertinent part: "The employer is liable for the negligence of the contractor * * * 2. If, according to previous knowledge and experience, the work to be done is in its nature dangerous to others, however carefully performed * * *."

8. See footnote 4, supra.

9. Ocean Steamship Company v. Hamilton, 112 Ga. 901, 38 S.E. 204.

must have found that the occurrence of two splice explosions, one within two years of completion and the other under the proven circumstance that it was part of the circuit which had long been de-energized and which occurred immediately upon being re-energized,[10] was notice to the Government that all splices were defective and required attention. This is especially so since the failure in 1944 fell exactly into the pattern depicted by the experts who testified that defective construction or insulation of a splice would cause a fault within two years. In any event, the question whether there was any notice was at most a question of fact which the court decided adversely to the plaintiff. We cannot hold that such finding was clearly erroneous.

As to plaintiff's criticism of the Government for permitting the electrical system to be used when it knew or ought to have known that it might explode, and in failing to warn the plaintiff of the danger, these contentions we think are answered by what has just been said. It does not apear that, assuming the splice to have become defective, the Government had any notice of that fact.

What has been said here has been on the assumption which we have indulged in order to test the strength of plaintiff's case, that he would be entitled to recover even though such recovery had to be founded upon the peculiar liability of imputed negligence under the Georgia law rather than, as the Government contends, being entitled to recovery only by showing such relationship as would bind the Government on the theory of respondeat superior. Having determined, as we do, that no right to recover even under his theory was shown to the satisfaction of the trial court, whose duty it was to make the findings of fact, it is not necessary for us again to give consideration to the argument of counsel to the effect that the Tort Claims Act is broad enough to encompass the type of liability which is permitted under the Georgia law.

The trial court briefly mentioned the theory of *res ipsa loquitur*, and appellant urges his right to recover on this theory although confidently asserting that he has shown sufficient facts to demand a finding of specific acts of negligence without reference to this principle. As the trial court pointed out, it would be impossible to hold the Government liable on the doctrine of *res ipsa loquitur* without finding that Lockheed was the Government's agent, since it is apparent that the facility, whose failure injured the plaintiff, was not within the exclusive control of the Government at the time of the unexplained occurrence, but was in the control of Lockheed. The trial court found that Lockheed was not an agent of the Government and thus found appellant's reliance upon this theory of recovery unfounded. We think that for another reason recovery on this theory could not be supported. As was stated by this court in Williams v. United States:[11]

"The doctrine of res ipsa loquitur is a rule of circumstantial evidence which permits the inference of negligence to be drawn from the occurrence of an accident upon proof of certain facts. Generally stated, the doctrine is that, in the absence of an explanation by the defendant when a thing which causes injury is shown to be under the management of the defendant, and the accident is such as in the ordinary course of things does not happen if those who have its management use proper care, a sufficient basis is afforded for a finding and conclusion that the accident arose from want of care. * * *"

Here there was ample evidence to show that a fault of the kind that is thought to have caused this injury can and does

---

10. Expert witnesses testified that deterioration is hastened when the system is de-energized and subsequently re-energized.

11. Williams v. United States, 5 Cir., 218 F.2d 473, at page 475.

occur in an electrical system without the negligence or want of care of any person. There is thus no case of *res ipsa loquitur* presented because the primary assumption is lacking.

We do not find that any of the alleged inconsistencies in the court's findings of fact or any of the errors in findings asserted by the plaintiff in its motion to amend the court's findings of fact relate to material matters necessary to a decision of this case.

No error in the judgment of the trial court having been shown, it is therefore.

Affirmed.

BROWN, Circuit Judge (dissenting).

Ray received devastating injuries for which, under Georgia law, a Georgia landlord would have been liable. A liability of the Government under the Tort Claims Act is denied, not because a landlord similarly situated would have been free from liability, but on the perfectly astounding doctrine that since an employee of a Georgia landlord would not have been liable to a third person (Ray) for failure properly to maintain the premises, the Government goes scot free. This is but a variation on its favorite theme, in major and minor key, that the simple words of the statute imposing liability, "in the same manner and to the same extent as a private individual under like circumstances," 28 U.S.C. § 2674, are to be read as though liability is based upon *respondeat superior* only. Consequently, it is urged there is no landlord's liability against the United States since this is "special" in nature (i. e., not based on *respondeat superior*) and does not exist even though based upon traditional notions of due care.[1]

It is plainly evident that the majority, deferring decision "at this time" does not profess to apply such standard. But since, in the final analysis, their affirmance rests altogether on the acceptance of the trial court's findings under the "clearly erroneous" concept of Rule 52(a), Fed. Rules Civ.Proc. 28 U.S.C., this is the inevitable consequence of the decision. If, therefore, the trial judge reached his conclusion laboring under a misapprehension of the applicable standard,[2] the case, as a minimum, requires a re-examination by him of the evidence uninfected by such findings. Fact findings made in an atmosphere of niggardly non-liability cannot form the basis either for an acceptance of them, as such, or affirmance of the case on the implied acceptance of them through the medium of a critical, logical analysis so characteristic of Judge Tuttle's opinions.

This analysis then has two facets: (1) Is it probable that the trial judge came under the spell of these contentions, and (2) is there any basis for them?

In this analysis we must sharply distinguish between the appeal these contentions hold for us and the impressions

---

1. This opinion accepts, as it must, the exclusion under Dalehite v. United States (Texas City Disaster Litigation), 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427, of liability for extraordinary, novel, new and unheard of, or absolute liabilities. Cf. Indian Towing Co. v. United States, 76 S.Ct. 122.

    Section 61–112, Code of Georgia, (footnote 6 majority opinion, supra), and Ocean Steamship Company v. Hamilton, 112 Ga. 901, 38 S.E. 204 (see footnote 9 majority opinion, supra) are in the plain terms of due care. Indeed, the statute is merely a codification of common law principles long recognized in Georgia imposing reasonable care on landlords: Monahan v. National Realty Co., 4 Ga.App. 680, 685, 62 S.E. 127,

    citing Mayor, etc., of Brunswick v. Braxton, 70 Ga. 193; White v. Montgomery, 58 Ga. 204; Freidenburg v. Jones, 63 Ga. 612, 614. See also Carolina Portland Cement Co. v. Columbia Improvement Co., 3 Ga.App. 483, 487, 60 S.E. 279.

2. Galena Oaks Corp. v. Scofield, 5 Cir., 218 F.2d 217, 219, " * * * 'Findings of fact that are induced by an erroneous view of the law are not binding * * '"; Owen v. Commercial Union Fire Ins. Co., 4 Cir., 211 F.2d 488; Magidson v. Duggan, 8 Cir., 212 F.2d 748, 752, "findings * * * are clearly erroneous * * * [when] (3) based upon an erroneous view of the law * * * "; see Fahs v. Tree-Gold Co-op. Growers of Florida, 5 Cir., 166 F.2d 40; Special Service Co. v. Delaney, 5 Cir., 172 F.2d 16.

likely created on the mind of a trial judge as careful and responsible as Judge Sloan. Inhibited only by authoritative precedents of the Supreme Court, we are free to pick and choose, accept and reject as we seek to fashion for this Circuit the guide in the construction of this Act. Indeed, we do it here—the majority by postponing, the dissent by a precipitous protest. But a conscientious district judge, appreciative of his position in the federal judicial scheme, enjoys no such freedom. He is overpowered not alone by specific holdings having the quality of *stare decisis,* but as much by the pronouncements in the Court's opinions where, in context, even though *obiter,* it seems quite convincing that the statement reflects an articulate policy, point of view or principle adopted by this Court. If our pronouncement is plain and quite positive, he will, whether he is legally obliged to or not,[3] bow to the declaration. It is not open for him to reject it as unessential, *obiter,* or the like.

In this atmosphere it is little wonder that Judge Sloan felt overwhelmed by the *respondeat superior* dogma. First, there is the general declaration by Chief Judge Hutcheson whose authorship, to bench and bar of this Circuit, gives added prestige, United States v. Campbell,[4] 5 Cir., 172 F.2d 500, 503, certiorari denied 337 U.S. 957, 69 S.Ct. 1532, 93 L. Ed. 1757:

> "The whole structure and content of the Federal Tort Claims Act makes it crystal clear that in enacting it and thus subjecting the Government to suit in tort, the Congress was undertaking with the greatest precision to measure and limit the liability of the Government, under the doctrine of *respondeat superior* * * *."

But before the time Judge Sloan decided this case, Judge Holmes, for a unanimous court, in Goodwill Industries of El Paso v. United States, 5 Cir., 218 F.2d 270, 272, relieved the district judges of the necessity or difficulty of determining liability in six categorical situations.[5] Judge Holmes's category (d) was our situation: If, under local (Georgia) law,

---

3. What we say, whether for the majority or in dissent, has so much nascent force on the district courts within our Circuit that it seems advisable to insert the phrase "whether he is legally obliged to or not" as an escape, if later needed, lest this free-lance description of the trial judge's embracing our dicta will itself become fiat.

4. Plaintiff was knocked down by a sailor running to board a troop train. The test, of course, was "in line of duty", 28 U.S.C. § 2671 (then § 941). Likening "line of duty" for military personnel to "scope of employment", Chief Judge Hutcheson found no basis for liability. However, it soon ceased to be the law for sailors only. See, e. g., In re Texas City Disaster Litigation, 5 Cir., 197 F.2d 771, 776: "The event around which the entire statute is built is an 'act or omission of an employee of the Government', and for the statute to be construed as a harmonious whole it must be so limited. See Sickman v. United States, 7 Cir., 184 F.2d 616, 619; United States v. Campbell, 5 Cir., 172 F.2d 500, 503. * * * So construed, the Act merely subjects the Government to the same *liability* as the *delinquent employee* in accordance with the local law." (Emphasis supplied.) Judge Sloan, in reading this for what it said, was in good company for the Eighth Circuit adopted it expressly, National Mfg. Co. v. United States, 8 Cir., 210 F.2d 263, 278.

5. "In summation, it follows that the appellant cannot recover against the United States: (a) for absolute liability without fault; (b) for novel and unprecedented causes of action; (c) for breaches of duty which are not held actionable under the law of the state where the injury occurred; (d) for acts or omissions of governmental employees who could not be held liable individually; (e) for acts or omissions of governmental employees in carrying out statutes or regulations; or (f) for acts of governmental employees involving a discretionary function, whether or not the discretion involved be abused. Feres v. United States, 340 U.S. 135, 71 S.Ct. 153, 157 [95 L.Ed. 152]; Dalehite v. United States, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427; Sickman v. United States, 7 Cir., 184 F.2d 616; United States v. Inmon, 5 Cir., 205 F.2d 681; National Mfg. Co. v. United States, 8 Cir., 210 F.2d 263; Strangi v. United States, 5 Cir., 211 F.2d 305; In-

584

the employee responsible for maintenance for the landlord could not be held liable, the Government would thereby be excused.

In the face of that deliverance by this Court, Judge Sloan was compelled to reject entirely the concept of liability based upon the Georgia Landlord Code Section if, as argued there and here, the Georgia law allows no recovery by the injured third person against the landlord's employee.[6] In that setting the argument, here and there, on the basis of our decision in Knight v. Atlantic Coast Line Railroad Company,[7] 5 Cir., 73 F.2d 76, 99 A.L.R. 405, had particular relevance holding, as it did, that the employee of a Georgia landlord (property owner) is not liable to a third party for the consequences of his nonfeasance.

While the judge was required to take this law as he found it in our various expressions, the standards thus supplied to him were erroneous. The fact is that there is no basis in the Act for the contention either that liability is wholly *respondeat superior*, or that there can be no liability against the Government un-

less one or more individuals can be found against whom the local law would allow recovery. The contention, in short, is but another one of those ingenious, artificial impediments to the clearly expressed Congressional will to impose liability, "in the same manner and to the same extent as [on] a private individual under like circumstances, * * *" 28 U.S.C. § 2674. That is language which could not be improved upon either from the standpoint of its simplicity or its scope. It was to announce that, except for those statutory exceptions, 28 U.S.C. § 2680, and those read into the law in the light of its purposes forbidding imposition of absolute liability without fault, the United States should become responsible to its citizens under all situations where private individuals would have an obligation. Read in this way, the obligation of the Government is measured by blending[8] § 1346(b) with § 2674. § 1346 (b) allows recovery for money damages for losses, "caused by the negligent or wrongful act or omission of any employee of the Government * * * where the United States [not the em-

dian Towing Co. v. United States, 5 Cir., 211 F.2d 886; Danner v. United States, D.C., 114 F.Supp. 477."

By now it had gone the full circle: The Eighth Circuit in National Mfg. cited the excerpt from our Texas City opinion (footnote 4, supra) and we repaid in kind.

The Goodwill case didn't involve category (d); it involved destruction of salvage clothing by migrant Mexican treaty contract laborers.

6. In colloquy with plaintiff's counsel on the evidence of prior explosions which plaintiff urged was proof of knowledge of defect or sufficient facts to impute knowledge under the concept of Ocean Steamship Company v. Hamilton, supra, the Judge said: "* * * Now that is a very far-fetched theory, and it is very slim to rest a case on."

7. A complaint charging that a railroad section foreman, who had the duty of maintaining a portion of the railroad's right of way and keeping it free of combustible material, had permitted material to remain on the land resulting in fire, was held insufficient to state a claim

against the railroad employee. Of course, the consequence of that decision was to impose the liability solely upon the railroad. The significance of this was spelled out in one syllable words by the Government in its brief here: "Thus, in this case, even if it be assumed that some Government employee was under a duty to inspect and repair the cables, his failure constituted a breach of duty owed by him to the United States but not to" Ray. The next step in the argument is that the employee not being liable, the landlord's liability cannot be derivative (i. e., *respondeat superior*) and must therefore be "special" and beyond the Act.

8. It is one single act. That § 1346(b) speaks in terms of jurisdiction makes it no more important than § 2674. The rearrangement, physical relocation in the Code, and slight changes in the text were without any significance. See Dalehite v. United States, supra, and specifically, United States v. Yellow Cab Co., 340 U.S. 543, 547, footnote 4, 71 S.Ct. 399, 95 L.Ed. 523; Feres v. United States, 340 U.S. 135, 140, footnote 9, 71 S.Ct. 153, 95 L.Ed. 152.

ployee], if a private person, would be liable * * * in accordance with the law of the place * * *." If the Government can be so easily excused because the breach of the duty was one owing to it, rather than to the third person, the reference to "act or *omission*" is largely superfluous. There is nothing in the legislative history to suggest that the Congress intended to engage in hair splitting refinements on the nature of the breach of duty or the precise person to whom the obligation of due care and proper performance of duty was owed. If an employee of the Government is obliged under the responsibilities of his position, whether he is a driver of a mail truck, a mechanic in the Government garage, a maintenance employee responsible for the upkeep of an elevator in a Post Office Building, he has an obligation properly to perform his job for his employer. A failure to carry it out is certainly an omission and a wrongful one. Moreover, it is a negligent one since it is a breach of a duty imposed by law.

The history of this Act carries the overpowering conviction that Congress recognized that in the operation of the United States Government, the world's largest single employer, engaged in far-flung industrial and business enterprises, with activity in a complex world, injury and damage was bound to occur. Society, Government, had therefore to protect its citizens against the consequence of that activity and, at the same time, free itself of the difficult task of achieving amelioration by sovereign grace through legislative procedures ill adapted to quasi adjudication.[9] Dalehite v. United States, supra, 346 U.S. 24, 25, 73 S.Ct. 962, 97 L.Ed. 1427. Many courts have rejected this parasitical appendage [10] and application of the rule produces such absurd [11] results that Con-

---

**9.** Our supposed tower of seclusion may, like Pisa, lean far enough for us to see Denver, Gettysburg and Washington and share, with all citizens, the national, unpartisan anxiety over the inroads made upon the physical stamina of not only the President, but his chief advisors in the Executive Department and, equally, the members of Congress upon whose shoulders, as human instruments, the peace of the world may well rest. If, for example, the Government's argument is sound so that the claim is outside the Act, then every citizen, as Ray, injured in such circumstances is entitled to pursue the former legislative relief. Private bills must grind slowly through the legislative process in the claims Committee of the House and Senate, are then subjected to time-consuming review by the Staff of the President's Office, the Bureau of the Budget, and all of the Executive Departments and Agencies concerned. (See footnote 9, Dalehite v. United States, supra, 346 U.S. at page 25, 73 S.Ct. 962) There is now a brisk business of such Tort Act rejected claims.

**10.** United States v. Hull, 1 Cir., 195 F.2d 64, 68, "* * * but 28 U.S.C. § 1346 (b) does not say that the United States is liable in tort only where the employee himself is legally liable to the person injured. In effect the United States argues for an interpretation of the latter part of the section as though it read '* * * if a private person, would . be liable to the claimant (and where the employee would also be liable to the claimant) in accordance with the law of the place * * *'—an unwarranted interpolation."

Jackson v. United States, 3 Cir., 196 F.2d 725, citing with approval Hull case, supra; United States v. Trubow, 9 Cir., 214 F.2d 192, approving both Hull and Jackson; cf. Blaine v. United States, D. C.E.D.Tenn., 102 F.Supp. 161.

Of course to equate the Government's liability in terms of that of its negligent employee is to revive for a defensive purpose a supposed right of recovery expressly denied under 28 U.S.C. § 2676 both to the injured plaintiff and to the Government on impleader for indemnity or contribution, United States v. Gilman, 347 U.S. 507, 74 S.Ct. 695, 98 L.Ed. 898.

**11.** This will be true even in the traditional "simple" intersection collision cases. For example, in Georgia, the rule is that the servant is not liable to the injured third person for nonfeasance, Atlantic Coast Line R. Co. v. Knight, 48 Ga.App. 53, 171 S.E. 919; a driver-mechanic assigned to the Commanding General, Fort Benning, Georgia, would cast the Government in liability for injury caused by his negligent operation of the General's car on official business resulting from sustained lack of sleep causing him to fall

gress, with the dual hope of relief to the citizen and to itself, could hardly have legislated in such a technical vein unless, contradicting the compassion of its entire approach, it proposed the return to the ancient forms with all of their very nice, and to them and to their day, vital distinctions. Moreover, landlord, property owner, liability on the concept of due care is recognized and applied as such [12] under the Tort Claims Act.

Misled by these pronouncements into the application of erroneous standards, the mistake was more than academic. Had the trial court felt really free to weigh it in the light of the Georgia landlord obligation, there was an abundance of evidence which would meet the terms of the Georgia Code itself and the Ocean Steamship Company principle of knowledge of the defect and reasonable opportunity to repair or maintain. The court did not find the contrary [13] and since what he did find came about as a result of the application of wrong standards, it is not for this court, in the first in-

asleep at the wheel. If, having been instructed to repair faulty brakes on the car, he fails to do it because he went to sleep on the job, and the same plaintiff was injured from the failure of the brakes properly to operate while the car was otherwise properly driven, the Government would escape because the driver would not be liable, under Georgia law, to the plaintiff for his nonfeasance.

It would introduce also hypertechnical distinctions wholly removed from Governmental operations in a true sense, resting entirely upon the accidental status of the injured plaintiff and the relationship to the negligent Government employee, e. g., a mail truck driver negligently crashes into an automobile parked at the curb injuring three occupants who, by the sheerest of coincidence, just happened to be the driver's minor son, the son's wife, and one unrelated. In many jurisdictions the driver vis-a-vis the minor son would not be liable. Small v. Morrison, 185 N.C. 577, 118 S.E. 12, 31 A.L.R. 1135; Sorrentino v. Sorrentino, 222 App.Div. 835, 226 N.Y.S. 907; Id., 248 N.Y. 626, 162 N.E. 551; nor would the husband to the wife, Harvey v. Harvey, 239 Mich. 142, 214 N.W. 305; similarly, in a community property state, were the injured party the wife of the driver, see Northern Texas Traction Co. v. Hill, Tex.Civ. App., 297 S.W. 778; Welch v. Bauer, 5 Cir., 186 F.2d 1002; cf. Nickerson v. Nickerson, 65 Tex. 281.

Of course, all of these nice subtleties involving transitory, accidental factors of status, quality of act, whether affirmative or negative of non rather than mal feasance are quite out of harmony with Indian Towing Co., Inc., v. United States, supra.

12. See footnote 10, supra, and following additional cases: State of Maryland for Use of Pumphrey v. Manor Real Estate, 4 Cir., 176 F.2d 414; Phillips v. United States, D.C.E.D.Tenn., 102 F.Supp. 943;

Brown v. United States, D.C.S.D.W.Va., 99 F.Supp. 685; Gilroy v. United States, D.C.D.C., 112 F.Supp. 664; Beasley v. United States, D.C.E.D.S.C., 81 F.Supp. 518; Lem v. United States, D.C.D.C., 89 F.Supp. 915; White v. United States, D. C.N.D.Cal., 97 F.Supp. 12; Claypool v. United States, D.C.S.D.Cal., 98 F.Supp. 702.

13. Although it was a detailed recitation, a careful reading of the record shows no real findings of fact as such. On the matters of critical importance, the court did find: "The explosion should not have occurred, and the question is presented of whether an inference of negligence may be drawn against the United States * * *." Likewise, "The engineers of Lockheed investigated the explosion and they are of the opinion that it was caused by a failure of the insulation of the cables which caused the high voltage current to go to ground." The conclusions of law merely recite excerpts from the Tort Claims Act, specific portions of the Georgia Code, including 61–112, and without discussing any of the evidence or making findings one way or the other, concludes: "No negligence proximately causing plaintiff's injuries has been shown. The plaintiff is not entitled to recover."

The rule requires more than a narrative recitation of events, contentions and conclusions in the hackneyed terms of an ultimate issue. For an intelligent review, the trial judge, in articulate fashion, should reflect the basic underlying reasons for his action. Kelley v. Everglades Drainage District, 319 U.S. 415, 63 S.Ct. 1141, 87 L.Ed. 1485; Ohlinger v. United States, 9 Cir., 219 F.2d 310; Refinery Equipment v. Wickett Refining Co., 5 Cir., 158 F.2d 710; Victory Towing Co. v. Bordelon, 5 Cir., 219 F. 2d 540; Maher v. Hendrickson, 7 Cir., 188 F.2d 700; Associates Discount Corp. v. United States, 5 Cir., 200 F.2d 537;

stance to make the findings unimpeded by the erroneous guide.

It is here, of course, that the Georgia law again applies which imposes upon one dealing with and responsible for the use and transmission of electricity the heavy obligation of extreme care comparable to one handling inherently dangerous articles. City of Sandersville v. Moye, 25 Ga.App. 64, 67, 68, 102 S.E. 552; Georgia Power Co. v. Stonecypher, 47 Ga.App. 386, 389, 170 S.E. 530; Southern Bell Telephone & Telegraph Co. v. Davis, 12 Ga.App. 28, 37, 76 S.E. 786; Eining v. Georgia Ry. & Electric Co., 133 Ga. 458, 461, 66 S.E. 237; Womack v. Central Georgia Gas Co.,[14] 85 Ga.App. 799, 803, 70 S.E.2d 398, 403; Georgia Power Co. v. Leonard, 187 Ga. 608, 613, 1 S.E.2d 579, 582.[15]

This makes pertinent indeed the uncontradicted testimony that upon the installation of the electrical system substantial defects were found both in the potential heads and in at least two splices of the type involved in this explosion, with no indication that any tests were made to determine the fitness of splices other than those two, followed by at least two identifiable explosions which were substantially similar to the occurrence of 1951. The Government made the curious defense, absorbed by the trial judge under the guile of its specious *respondeat superior* contention, and acquiesced in by the majority here under the compunction of the "clearly erroneous" rule that since this splice had not failed before, in exploding had obliterated all evidences of its failure, and having served from 1943 to 1951 without failure, it could not have been defective. This was, of course, in complete disregard of the Georgia rule [16] and that of this court.[17]

Even more startling was the Government's contention absorbed by the majority, " * * * there was ample evidence to show that a fault [presumably a failure of the electrical system] of the kind that is thought to have caused this injury can and does occur in an electrical

Hunter Douglas Corp. v. Lando Products, 9 Cir., 215 F.2d 372. This is particularly true of Tort Claims cases where disputed facts, commonly determined by a jury, must be found by the judge. Irish v. United States, 9 Cir., 225 F.2d 3.

14. "Ordinary care as to a thing which is subtle, violent, and dangerous, such as gas or electricity, may require a greater degree of caution than does an agency which lacks these dangerous propensities."

15. Quotes with approval Cooley on Torts (Third edition 1942): " 'Electricity is an invisible impalpable force highly danerous to life and property, and those who make, distribute, use, or handle it are bound to exercise care in proportion to the danger involved.' "

16. Similar prior incidents are substantial and probative in establishing defective condition, knowledge, etc.; Standard Cotton Mills v. Cheatham, 125 Ga. 649, 54 S.E. 650; Comer Co. v. Joiner, 32 Ga. App. 661. 124 S.E. 356; Central of Georgia Ry. Co. v. Keating, 45 Ga.App. 811, 814, 165 S.E. 873. See also Brewer v. United States, D.C., 108 F.Supp. 889;

Baltimore & O. R. Co. v. Moore, 3 Cir., 13 F.2d 364; Patterson v. Pennsylvania R. Co., 2 Cir., 197 F.2d 252.

17. Texas & P. Ry. Co. v. Carlin, 5 Cir., 111 F. 777, 781, 60 L.R.A. 462, affirmed on other ground 189 U.S. 354, 23 S.Ct. 585, 47 L.Ed. 849. In this landmark case the plaintiff was injured when a maul, left on a railroad bridge, was struck by a passing train, breaking the handle, hurling the maul against his leg. Rejecting the contention that such an accident had not happened before, we stated: "It may be true that the negligence in this case produced an effect not before observed, the circumstances of which could not have been anticipated. * * * The extraordinary circumstances attending the injury cannot serve as a defense. To so hold would be to say that a plaintiff must show similar injuries to have occurred in the same manner before he could recover. And it would lead to the anomalous result that for the first, and perhaps the second, injury occurring in such manner there could be no recovery; but for the third, or when the circumstances ceased to be peculiar or became familiar the defendant would be liable."

system without the negligence or want of care of any person." [18] Considering that Georgia looks upon high voltage electricity as the dangerous, even though useful, agency that it is, the history of improper installation, probably inadequate correction, and at least two failures substantially similar was enough to at least require the trial judge seriously to weigh that evidence in the light of the Georgia doctrine imposing liability for damages for failure to keep the premises in repair. The premises remained the property of the United States. Under its contract with Lockheed, it was obliged to furnish and maintain a complete plant, including electrical power circuits. That would include, of course, this electrical circuit with its potential hazard and its lurking indefinite, uncertain capacity for great harm. The Government had warnings over a period of 8 years that its system was failing. Accepting the Government's argument that circuit failures are unavoidable, this very uncertainty imposed, in keeping with Georgia principles, the duty of high diligence in the inspection and maintenance of a facility so destructive by nature.

Of course, the destruction of the evidence should not, in these days, produce a stalemate in justice. The common law imported by Congress through the Tort Claims Act has the capacity for great flexibility as it meets the demands of this industrial age. Viewed with an open mind, unshackled by pronouncements laying down erroneous standards of liability, there was ample evidence to satisfy the demands of causation. If needed, *res ipsa loquitur* was available [19] against the Government and sufficient to bridge the gap if it existed. The shibboleth of exclusive possession and control does not exclude its use here.[20]

It is not necessary to determine now whether these conclusions were compelled or only permissible. Ray was entitled to a decision based on the imprint of this evidence on a mind unfettered by false and specious dogma. The Georgia law of landlord liability is fair, equitable, and subjects the Government only to the standard of reasonable prudence and care which Congress so clearly intended to be the guide for public Governmental activity. The evidence needs weighing in the scales of that doctrine.

The judgment should therefore be reversed for a new trial.

I therefore dissent.

Rehearing denied: BROWN, Circuit Judge, dissenting.

---

18. The evidence showed, the Government frankly stated on argument, that explosions and failures of a high voltage electrical system occur all the time. In the brief this was stated more formally (footnote 11): "None of the experts called could state with any precision the normal life of a sound properly-installed cable or a properly made splice. Circumstances, some of which are unknown, control the life of a cable and often even an expert cannot tell the cause of an electrical malfunction * * Some cables with a supposed long life fail early and others last longer than expected * * * Some splices have lasted as long as 35 years * * *, while other properly made splicings frequently may blow out or explode within ten years' time * * *."

19. The following tort claims cases expressly recognize and apply *res ipsa loquitur*: D'Anna v. United States, 4 Cir., 181 F.2d 335; United States v. Kesinger, 10 Cir., 190 F.2d 529; United States v. Johnson, 9 Cir., 181 F.2d 577; United States v. Hull, supra; Hampton v. United States, D.C.Nev., 121 F.Supp. 303; Bandy v. United States, D.C.Nev., 92 F.Supp. 360.

20. The possession of the plant was in the Government's agent-contractor, but the record is uncontradicted that with no motive to assert otherwise (it was a cost plus arrangement with full reimbursement to the contractor), Lockheed's acknowledged experts concluded that the explosion was due to a failure of insulation. There was no evidence of an excessive or sudden load on the line or any other act by Lockheed which could have accounted for it. All other probable causes, electrolysis, water seepage, lightning, and pinholes were excluded. On the record it left only failure in the insulation.