**Noreen A. LOWRY, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civil Action No. 91–11233–MLW.**

United States District Court,
D. Massachusetts.

Feb. 12, 1997.

Lewis C. Eisenberg, Quincy, MA, for Noreen Lowry.

Countess C. Williams, U.S. Attorney's Office, Boston, MA, Annette Forde, Paul G. Levenson, U.S. Attorney's Office, Boston, MA, for U.S.

## MEMORANDUM AND ORDER ON PLAINTIFFS MOTION TO RECONSIDER MOTION TO AMEND AD DAMNUM CLAUSE (# 36)

COLLINGS, United States Magistrate Judge.

### I. INTRODUCTION

In this Federal Tort Claims Act[1] case, the Court is faced with the question of whether the provisions of 28 U.S.C. § 2675(b) bar the plaintiff from increasing the amount of damages stated in her administrative claims, i.e., from $600,000.00 to $1,500,000.00. In a Memorandum and Order (# 22), the Court answered the question in the affirmative. On the first day of the non-jury trial, the plaintiff filed a motion requesting the Court to reconsider its ruling. The issue is whether the plaintiff has shown that "... the increased amount is based on **newly discovered evidence not reasonably discoverable at the time of presenting the claim** to the federal agency, or [has alleged and proven] **intervening facts, relating to the amount of the claim.**" 28 U.S.C. § 2675(b) (emphasis added).

1. Hereinafter, "FTCA."

2. Exhibit A to # 14.

### II THE FACTS

The plaintiff was injured when her car was rear ended by an F.B.I. employee on Interstate 93 in Boston on November 23, 1988. An administrative claim with the F.B.I. was filed on March 23, 1989. In that claim, the plaintiff in the box denoted "personal injury" under the general category "amount of claim" wrote "Extent of damages ongoing; projection is in excess of $100,000."[2] On September 24, 1990, the plaintiff submitted a "supplemental form"[3] on which she entered the sum of $600,000.00 in the box denoted "personal injury."[4] No action having been taken by the F.B.I. within six months, the plaintiff filed the instant civil action on May 1, 1991. There is no question that the case was filed within the applicable statute of limitations. The motion to increase the ad damnum to $1,500,000.00 was filed on April 23, 1992. The basis for the motion was as follows:

> The plaintiff has had ongoing medical treatment since the time of her original accident. Even after her filing of the Supplemental Form 95 (Exh. B) in September, 1990, the plaintiff has been undergoing a significant amount of physical therapy. Most recent medical testing was concluded in February, 1992. A comprehensive report was received shortly thereafter, see *infra.* It was based upon this most recent information that a further rehabilitation analysis by a specialist along with an economic analysis of the impairment to earning capacity has been finalized. These additional matters give rise to "intervening facts" which relate to the amount of her claim.

> &ast; &ast; &ast; &ast; &ast; &ast;

> The plaintiff relocated to California in late 1990.

> &ast; &ast; &ast; &ast; &ast; &ast;

> [A] physician in California, John Fagan, M.D. (an internist), requested that an MRI be performed of the low back. The

3. Hereinafter, "supplemental administrative claim."

4. Exhibit B to # 14.

scanning was done on July 9, 1991 at San Antonio Community Hospital with a diagnosis of a small disc herniation at the LA–L5 (Exh. H). This is the first diagnosis of a low back herniation . . .

\* \* \* \* \* \*

As of October 7, 1991 the plaintiff came under the care of Inland Neurological Associates, Dr. Jan David Rosenthal. His comprehensive report of March, 1992 . . . As his report notes, the most recent diagnostic testing that the plaintiff has completed was in February, 1992. The doctor is of the opinion that the plaintiff has sustained, *inter alia,* a "disc bulge at LA–5" and is satisfied that there is causation. The doctor notes the work restrictions for the plaintiff, her disability status, and her future medical needs. He notes that her condition is permanent and she is precluded from doing any "heavy lifting, repetitive bending and stooping, as well as repetitive reaching or lifting overhead." (footnote omitted).

It is based on this most recent report of Dr. Rosenthal (Exh. I) that the plaintiff has formalized the assessment for rehabilitation and employability prospects along with her economic loss.

Memorandum, Etc. (# 14) at pp. 2, 4–5.

In sum, therefore, plaintiff's claim of "newly discovered evidence" and "intervening facts" rests on the discovery of the "disc bulge" in 1991 and the fact that experts viewed her disability as being permanent.

The disc bulge at L4–L5 is in the lower back; it must be distinguished from the "herniation of C–5 and C–6 Discs" in the neck area which plaintiff referenced in her original claim.[5] In her original claim, plaintiff noted that she suffered from "Lumbar strain, Lower Back strain".[6] In her supplemental administrative claim, she wrote that she suffered from "Herniation of C5–6 disc, lumbar

strain, lower back strain, chronic pain; involved in extensive physical therapy."[7]

A review of plaintiff's medical records and history from the date of the accident on November 23, 1988 to the date of her supplemental administrative claim on September 24, 1990, as admitted at the trial, is in order. From a time shortly after the automobile accident in late November, 1988, up to the date in September, 1990 when her supplemental administrative claim was filed, Ms. Lowry was treated by Gregory W. Brick, M.D., an orthopedic specialist with Brigham Orthopedic Associates, Inc. in Boston, Massachusetts.[8] Her first visit was on November 5, 1988; the doctor's notes indicate that as a result of the accident, "[s]he developed severe neck pain and low back discomfort and has continued to experience this since."[9] She continued to see Dr. Brick every month or two; the complaints of low back pain continued. On August 14, 1989, Dr. Brick wrote:

She·is to have a CAT scan of the lumbar spine to be sure there is no evidence of disc herniation . . . [10]

The CAT scan of the lumbar spine was taken on August 28, 1989. The results, in pertinent part, were as follows:

At the level of L4–5, there is a diffuse disc bulge with impingement on the thecal sac anteriorly.

IMPRESSION:

1. Diffuse bulge at L4–5 resulting in mild canal stenosis. No evidence of HNP.[11]

Dr. Brick testified that "no evidence of HNP" meant that there was no evidence of a herniated disc.[12]

In a report dated January 30, 1990, Dr. Brick confirmed that Lowry had a C5/C6 disc herniation but made no mention of the L4–5

**5.** Exhibit A to # 14.

**6.** Exhibit A to # 14.

**7.** Exhibit B to # 14.

**8.** Exhibit C to # 14.

**9.** Trial Exhibit # 14a.

**10.** Trial Exhibit # 14a.

**11.** Trial Exhibit # 14e. "HNP" means "herniated nucleus pulposis." Trial Exhibit # 20 at p. 30.

**12.** Trial Exhibit # 19 at p. 72.

bulge.[13] He described Lowry as experiencing chronic neck pain and back pain.[14] Dr. Brick opined that Lowry was unable to return to work as an orthopedic nurse, but that return to a clinical situation with more administrative duties may be possible.[15] Lowry was deemed "likely" to be able to return to work within 3–6 months.

Eight months later, on August 21, 1990, Dr. Brick authored a second report.[16] Lowry's C5/C6 disc protrusion was confirmed, as was the fact that she suffered chronic neck pain and low back pain.[17] At this juncture, Dr. Brick opined "[i]t is possible in the future that Noreen (sic) symptoms will improve and she will be able to return to some occupation which would not involve heavy lifting." [18] The possibility of surgery for the disc herniation was also noted.[19] Finally, Dr. Brick stated that Lowry "may require long-term physical therapy for her symptoms." Indeed, from December, 1988 through July 1990 Lowry had 105 office visits at Needham Physical Therapy Associates for physical therapy treatment.[20]

Lowry has also produced evidence that the Department of Health and Human Services determined her to be totally disabled as of March 1, 1989 and therefore entitled to Social Security disability benefits.[21]

On the basis of these facts, on September 16, 1990, Lowry filed her supplemental administrative claim seeking $600,000.00 in damages for personal injuries listed as "[h]erniation of C5–6 disc, lumbar strain, lower back strain; chronic pain; involved in extensive physical therapy." [22]

In late 1990, Lowry relocated to California. Upon the order of Douglas Beseth, M.D., in March of 1991 Lowry began a physical therapy treatment program at Mountain View Physical Therapy, Inc. which continued.[23] At the request of John Fagan, M.D., an MRI was performed on Lowry's lower back in early July, 1991, revealing the following:

At L4–L5, there is a slight narrowing of the disc. There is suspicious small right anterolateral disc protrusion that appears to be in very close proximity to the existing L4 nerve root . . .

IMPRESSION:

Mild narrowing of the disc at L4–L5.

Suspicious small disc herniation along the right anterolateral aspect of the thecal sac with suspicious impingement on the existing right L4 nerve root.[24]

This was the first time that a diagnosis of a disc **herniation** at L4–L5 was rendered. What counsel failed to mention in his original motion and memorandum was the fact a **bulge** at L4–L5 had been found over a year before the supplemental administrative claim for $600,000.00 was filed. Indeed, a good deal of the United States' brief in opposition to the motion to increase the ad damnum was devoted to the fact that the L4–L5 disc bulge could have been discovered before September 24, 1990. *See* # 16. As the evidence at trial plainly revealed, it was. Whether the distinction between a bulge and a herniation is sufficiently material will be further discussed, *infra*.

In March of 1992, Dr. Jon David Rosenthal of Inland Neurological Associates performed a neurological examination of Lowry. In his report, Dr. Rosenthal notes that Lowry was seen "complaining of neck and low back discomfort, as well as headaches and dizziness." [25] Among Dr. Rosenthal's impressions he listed "post traumatic l5/6 radiculopathy" and "post traumatic C4/5 radiculopathy 3

13. Exhibit C to # 14.

14. Exhibit C to # 14.

15. Exhibit C to # 14.

16. Exhibit D to # 14.

17. Exhibit D to # 14.

18. Exhibit D to # 14.

19. Exhibit D to # 14.

20. Exhibit E to # 14.

21. Exhibit E to # 14.

22. Exhibit B to # 14.

23. Exhibits G & H to # 14.

24. Exhibit H to # 14.

25. Exhibit I to # 14.

mm. disc bulge." [26] Dr. Rosenthal concluded that as of March 13, 1992, Lowry had a permanent "disability based on her injuries to her neck and low back precluding heavy lifting, repetitive bending and stooping, as well as repetitive reaching or lifting overhead." [27]

### III. THE STATUTE—IS IT TO BE STRICTLY CONSTRUED?

The applicable provision of the FTCA, i.e., 28 U.S.C. § 2675(b), provides as follows:

(b) Action under this section shall not be instituted for any sum in excess of the amount of the claim presented to the federal agency, except where the increased amount is based on **newly discovered evidence not reasonably discoverable at the time of presenting the claim** to the federal agency, or **upon allegation and proof of intervening facts, relating to the amount of the claim.**

Emphasis supplied.

The first issue is whether the statute is to be strictly construed. In the case of *Lopez v. United States,* 758 F.2d 806 (1 Cir., 1985), the Court wrote:

Congress passed the Federal Tort Claims Act in 1946 to remove the sovereign immunity of the United States in private tort actions, and amended the Act in 1966 to streamline the administrative procedures which served as prerequisites to the right to file a complaint in federal court. (footnote omitted) Although the legislation is a waiver of the government's traditional privilege to be free from suit, and thus must be construed strictly, *United States v. Sherwood,* 312 U.S. 584, 590, 61 S.Ct. 767, 771, 85 L.Ed. 1058 (1941), the Act was designed to accord injured parties an opportunity for recovery "as a matter of right", S.Rep. 1400, 79th Cong., 2d Sess. 30, 31 (1946), and the 1966 amendments were designed in part to "provid[e] for more fair and equitable treatment of private individuals and claimants when they deal with the Government or are involved in litigation with their Government."

S.Rep. No. 1327, 89th Cong., 2d Sess. 2, *reprinted in* 1966 U.S.Code Cong. & Ad. News 2515, 2516 ("Senate Report 1327"). Thus, we approach this case recognizing that individuals wishing to sue the government must comply with the details of the law, but also keeping in mind that the law was not intended to put up a barrier of technicalities to defeat their claims.

*Lopez,* 758 F.2d at 808–09.

While it may not make a difference in practical terms, other courts have held that the FTCA is not to be strictly construed. Relying on the Supreme Court decision in *United States v. Yellow Cab Co.,* 340 U.S. 543, 71 S.Ct. 399, 95 L.Ed. 523 (1951), the Fifth Circuit in the case of *United States v. Alexander,* 238 F.2d 314 (5 Cir., 1956) wrote that:

By its opinion the Supreme Court held that the Act is to be liberally construed. The rule of strict construction, applicable to other statutes waiving governmental immunity, does not apply to the Federal Tort Claims Act. *O'Toole v. United States,* 3 Cir., 1953, 206 F.2d 912. *See Somerset Seafood Co. v. United States,* 4 Cir., 1951, 193 F.2d 631. This Court has said that the Act, as an immunity statute, was subject to the strict construction rule. *Hubsch v. United States,* 5 Cir., 1949, 174 F.2d 7, **remanded** 338 U.S. 440, 70 S.Ct. 225, 94 L.Ed. 244, **dismissed on motion of petitioner** 340 U.S. 804, 71 S.Ct. 35, 95 L.Ed. 590. The view expressed in the *Hubsch* case must yield to the rule thereafter announced by the Supreme Court in *United States v. Yellow Cab Co., supra.*

*Alexander,* 238 F.2d at 317.

While the *Yellow Cab* case involved a question not present in this case, i.e., whether a defendant in a tort case could seek contribution by impleading the United States as a third-party defendant, the issue in the *Alexander* case was the proper construction of the section at issue in the instant case, i.e., 28 U.S.C. § 2675(b).

Referring to the FTCA in connection with an issue regarding the proper statute of limitations, the Supreme Court wrote:

---

**26.** Exhibit I to # 14.

**27.** Exhibit I to # 14.

We should also have in mind that the Act waives the immunity of the United States and that in construing the statute of limitations, which is a condition of that waiver, we should not take it upon ourselves to extend the waiver beyond that which Congress intended. Neither, however, should we assume the authority to narrow the waiver that Congress intended. *United States v. Kubrick,* 444 U.S. 111, 117–18, 100 S.Ct. 352, 357, 62 L.Ed.2d 259 (1979) (citations omitted). The Second Circuit has interpreted this language to hold that "[t]he FTCA, as a statute waiving sovereign immunity, must be complied with strictly." *O'Rourke v. Eastern Air Lines, Inc.,* 730 F.2d 842, 856 (2 Cir., 1984).[28]

On the basis of these precedents, I doubt if it is correct to say that the statute must be "strictly construed." Rather, the key question is what Congress meant by the terms it used in § 2675(b) which permit an increase in the ad damnum over and above the amount stated in the administrative claim. Once it can be determined what Congress meant, I will approach the application of § 2675(b) to the facts of this case as the First Circuit did in the *Lopez* case, i.e., "... recognizing that individuals wishing to sue the government must comply with the details of the law, but also keeping in mind that the law was not intended to put up barriers of technicalities to defeat their claims." *Lopez,* 758 F.2d at 809.

## IV. THE PLAIN WORDING OF THE STATUTE

■ It is important to note that 28 U.S.C. § 2675(b) provides two ways in which a plaintiff can increase the ad damnum above what was stated in the administrative claim. The first is "newly discovered evidence not discoverable at the time" the claim was presented. The second is by "allegation and proof of intervening facts ..." The statute uses the conjunction "or" between these phrases, so a plaintiff has to meet only one of the two tests to increase the ad damnum; it is not required that a plaintiff meet both tests.

The fact that Congress used two different phrases would indicate that the phrases were intended to mean different things. The phrase "newly discovered evidence" would seem to denote evidence which existed at the time the administrative claim was filed but was "not discoverable" at that time. On the other hand, the term "intervening facts" denotes things occurring after the filing of the claim.

## V. THE MEANING OF THE STATUTE AS GLEANED FROM THE CASE LAW

It is clear that "[t]he burden of establishing ... 'newly discovered evidence' or 'intervening facts'... rests on the claimant plaintiff." *Kielwien v. United States,* 540 F.2d 676 (4 Cir.), *cert. denied,* 429 U.S. 979, 97 S.Ct. 491, 50 L.Ed.2d 588 (1976) citing *Smith v. United States,* 239 F.Supp. 152, 154 (D.Md., 1965); *Monday v. United States,* 688 F.Supp. 788, 791 (D.Me., 1988) citing *DeGroot v. United States,* 384 F.Supp. 1178 (D.Iowa, 1974). But it is necessary to canvas the case law to determine as nearly as possible the meaning of the two phrases. The most extensive discussion of the statute by the First Circuit occurred nine years ago in the case of *Reilly v. United States,* 863 F.2d 149 (1988). In order to define the dimensions of the analysis which is to be employed in deciding whether the statutory prerequisites have been met, it is useful to review cases decided before *Reilly.*

### A. The Case Law Before *Reilly v. United States.*

In the case of *Phillips v. United States,* 102 F.Supp. 943 (E.D.Tenn., 1952), the plaintiff was injured when, as she was holding a door open for her husband, her hand came in contact with a broken pane of glass on the door. *Id.* at 945. She required stitches to close the wound; the wound later became infected. *Id.* She subsequently had surgery, and was advised that "... the wound would probably heal and that [she] would not be

---

**28.** As discussed, *infra,* the *O'Rourke* case dealt with the provision of the FTCA at issue in the

instant case, i.e., 28 U.S.C. § 2675(b).

totally disabled in the use of her right hand." *Id.* After the surgery, she filed a claim for $1,000.00. *Id.* at 948. A month later she had developed tenositis which, among other things, caused her fingers to draw into the palm of her hand; the doctors opined that her condition was "permanent and will grow progressively worse" and that the disability to her right hand was 100%. *Id.* at 946. The Government sought to limit her recovery to that amount. The Court ruled that:

> This drawing of the fingers ... could not reasonably have been discovered before the filing of the claim for the reason that the drawing had not commenced, or manifested itself until after [she had filed her claim].

> \* \* \* \* \* \*

> This final defense of the Government is untenable for the reason that evidence of the serious condition and progressive development of the plaintiff's affliction was discovered after she had filed her claim and could not reasonably have been discovered prior thereto. This situation constitutes the proof of intervening facts required by sub-section 2675(b) ...

*Phillips,* 102 F.Supp. at 949.

This case reflects a theme which appears in various manifestations in later cases. The theme is that whether the plaintiff is seeking an increase under the rubric of "newly discovered evidence" or "intervening facts," one of the key issues is foreseeability. If the condition was reasonably foreseeable at the time the claim was filed, an increase will not be allowed. On the other hand, if it was not, as the Court found it was not in the *Phillips* case, an increase may be allowed.

In the case of *Morgan v. United States,* 123 F.Supp. 794 (S.D.N.Y., 1954), the plaintiff was struck by an Army truck. *Id.* at 795. He filed a claim for $1,000.00; the Court refused to allow an increase. *Id.* at 798. The Court found that:

> [T]here has been no change in the plaintiff's condition—no aggravation or setting up of a new condition. Plaintiff testified, when he filed his claim, he 'did not know that his condition would last so long' but he made no effort to find out before he filed the claim.

*Morgan,* 123 F.Supp. at 798.

This case illustrates a second theme found in the cases. Plaintiff has to be reasonably diligent in attempting to discover those facts which are discoverable before filing a claim; otherwise, an increase in the ad damnum will not be allowed.

In *United States v. Alexander, supra,* the plaintiff, while riding a motorcycle, sustained a broken arm and a dislocated shoulder in a collision with a government vehicle. *Alexander,* 238 F.2d at 315. He filed a claim a month later; at the time of filing, the plaintiff did not know if the shoulder would mend without surgery. *Id.* When he filed suit, he sought to increase the amount he sought to recover on the ground that:

> ... [S]ubsequent to the filing of the administrative claim it was discovered that his shoulder was not responding to treatment, had become aggravated, and an operation would be required.

*Alexander,* 238 F.2d at 315.

The district court agreed with the plaintiff and allowed recovery in excess of the amount of the administrative claim finding an "... allegation and proof on intervening facts relating to the amount of the claim which were not reasonably to be anticipated at the time of filing the claim ..." *Id.* at 318. The Court of Appeals affirmed, writing:

> It may be that in the absence of any knowledge on the part of the plaintiff, at the time of the filing of the administrative claim, that his shoulder would not heal without surgery and the impossibility of then acquiring such knowledge at the time of presenting the claim, the subsequent ascertainment of such knowledge should be treated under the category of newly discovered evidence rather than as intervening facts. It is clearly one or the other and, being, (sic) so, the plaintiff is not limited in his recovery to the amount of his administrative claim.

*Alexander,* 238 F.2d at 318.

The Fifth Circuit considered the issue nineteen years later in the case of *Molinar v. United States,* 515 F.2d 246 (5 Cir., 1975) in

which plaintiff claims injury to his left knee. Without much discussion, the Court ruled that the award in excess of the amount of the administrative claim "... is supported by reason of the three knee operations, and the ensuing treatment ... These were 'intervening facts,' which plaintiff alleged and proved ..." *Molinar*, 515 F.2d at 249.

In 1976, the Fourth Circuit, in the case of *Kielwien v. United States, supra*, 540 F.2d 676, reversed a district court's award of increased damages based on proof of an "intervening fact." *Id.* at 677. Plaintiff's injury occurred on October 1, 1970; her claim was filed on October 1, 1971. She based her request for recovery in excess of the administrative claim on a contention that "... she did not know the full extent of her injuries ..." until December 1971 and January 1972. *Id.* at 680. The Court of Appeals held that what the plaintiff was told after she filed her claim was "cumulative" and "confirmatory" of what the plaintiff had repeatedly been told by doctors before she filed her claim. *Id.* Put another way, the plaintiff knew the diagnosis and extent of her disability when she filed her claim; thus, later advice to the same effect could not be an "intervening fact." *See also Spivey v. United States*, 912 F.2d 80, 85–86 (4 Cir., 1990).

In the case of *Husovsky v. United States*, 590 F.2d 944 (D.C.Cir., 1978), the plaintiff was severely injured on August 19, 1968 and the United States was found liable. A claim for $500,000.00 was presented to the administrative agency in July, 1969; suit was brought for $2,500,000.00. *Husovsky*, 590 F.2d at 954. The reason for the increase was that between the time of the filing of the claim and the time for trial, the prediction of the plaintiff's life expectancy had changed for the better and that increased life expectancy "... increased the amount of kidney dialysis and medical treatment he would require in

the future." *Id.* at 954–55. The evidence was that in September, 1968, the doctors did not think the plaintiff would live for more than three to eight years; however, in September, 1969, doctors reported a "striking improvement" which increased their estimates of his life expectancy. *Id.* at 954. The Court of Appeals affirmed, stating that the plaintiff had alleged and proven "intervening facts, relating to the amount of the claim." *Id.* at 955. Evidently, it was not foreseeable when the claim was filed that the plaintiff would improve so dramatically.

In the *O'Rourke* case, the Second Circuit summarized the case law to that point by stating that:

> ... [C]ourts that have ruled on the scope of this section have granted motions to amend *ad damnum* clauses only when an unexpected change occurred either in the law or in a medical diagnosis.
>
> \* \* \* \* \* \*
>
> In all of these cases, there was some indication that the amount of the original claim was calculated on the basis of known facts at the time of filing and that, subsequently, some new and previously unforeseen information came to light.

*O'Rourke*, 730 F.2d at 856.

In the *O'Rourke* case, the decedent was a Greek seaman. The asserted reason for the request to increase the ad damnum was that an "intervening fact" had been proven, i.e., that the wages of Greek seaman had risen in an unprecedented manner since the filing of the administrative claim, and thus the amount of future lost wages was greater. *Id.* at 855. The Second Circuit stated that although the wages had risen "dramatically," there was no claim that the rise was "unforeseen." [29] Accordingly the district court should not have allowed the requested increase. *Id.* at 856.[30]

---

**29.** *But see McMichael v. United States*, 856 F.2d 1026, 1035–36 (8 Cir.,1988) wherein the Court of Appeals upheld a recovery in excess of the administrative claim because unprecedented inflation qualified as an "intervening fact". *Id.* at 1035. The court "fully supported" the district court's finding that the inflation between 1976 and 1986 whereby the dollar decreased in value by 50% was "unforeseeable." *Id.* The court also

noted that it was "unforeseeable" that the case would remain in litigation for ten years. *Id.*

**30.** *The O'Rourke* decision casts considerable doubt on the holding in the case of *Georgakis v. Eastern Air Lines, Inc.*, 16 Avi. 17,737 (E.D.N.Y., 1981). In *Georgakis*, the district court allowed an increase in the ad damnum because of the "... testimony of three witnesses who were first consulted shortly before trial ...". *Id.* at 17,738.

In *Powers v. United States,* 589 F.Supp. 1084 (D.Conn., 1984), a case decided a few months after *O'Rourke,* the Court summarized the law as follows:

> Diagnoses which are merely cumulative and confirmatory of previous diagnoses do not constitute either "newly discovered evidence" or "intervening facts," for the purposes of this statute. *Kielwien v. United States,* 540 F.2d 676, 680–1 (4th Cir.1976), *cert. denied,* 429 U.S. 979, 97 S.Ct. 491, 50 L.Ed.2d 588. However, when a plaintiff does not know fully the "medical extent of his injuries and expenses" at the time of his administrative complaint, the exceptions to § 2675(b) are triggered. *Rabovsky v. United States,* 265 F.Supp. 587, 588 (D.Conn.1967), *Campbell v. U.S.,* 534 F.Supp. 762, 766 (D.Haw.1982).

*Powers,* 589 F.Supp. at 1110.

Applying this standard to the facts of the case, the Court wrote:

> Considering the facts of this case, the Court finds that Powers' situation fits more precisely into the latter category than the former. Although the plaintiff's administrative complaint ... alleged a general postoperative paralysis of both arms, the increasing degree of such paralysis, the muscular atrophy, the worsening pain associated therewith, and the unanticipated need for extensive nursing care, arising from the substantial deterioration of the health of both Mrs. Powers, who previously could have been looked to for assistance and of the plaintiff, constitute "newly discovered evidence not reasonably discoverable" in 1976 and "intervening facts, relating to the amount of the claim."

*Powers,* 589 F.Supp. at 1110.

The Eleventh Circuit reached a similar result in the case of *Fraysier v. United States,* 766 F.2d 478 (11 Cir., 1985). In that case, the plaintiff received a swine flu injection in 1976, was hospitalized in 1977 and treated for a "systemic bacterial infection," gradually improved over the next year and

filed an administrative claim in January, 1978 for $50,000.00. *Id.* at 479. He filed suit two and a half years later seeking $1,500,000.00. *Fraysier,* 766 F.2d at 479. The Court found record support for plaintiff's conclusion that when he filed his administrative claim, he believed his condition was temporary. *Id.* at 480. By the time the lawsuit was filed, there was evidence that the plaintiff had Gullain–Barre syndrome (GBS) which was caused by the swine flu injection. *Id.* While one doctor had suggested before the claim was filed that the plaintiff may have GBS, that doctor made no diagnosis of GBS and two others opined that the plaintiff did not have GBS. *Id.* The Court affirmed the district court's allowance of the increase in the ad damnum, writing:

> The purpose of section 2675(b) undoubtedly is to limit claims on which there is only a change in valuation between the agency claim and the lawsuit. That is not the case here. The physical effect of the injury was apparently about the same at the agency level as it was a trial. That those effects remain permanent, was not known at the agency level.

> \* \* \* \* \* \*

> Now that it is known that the injuries were caused by GBS and given their duration, permanency is predictable. Permanent injuries obviously warrant more damages than temporary ones.

*Fraysier,* 766 F.2d at 480.

The Court also rejected the Government's argument that the condition was "reasonably discoverable" at the time of the filing of the administrative claim; it affirmed the district court's finding that "a prediction of plaintiff's improvement could not have been made with any certainty at the time of filing ..." and that "[p]laintiff should not be charged with knowing what the doctors could not tell him." *Fraysier,* 766 F.2d at 481.

The Eleventh Circuit followed the *Fraysier* holding in the case of *Cole v. United States,* 861 F.2d 1261, 1262 (11 Cir., 1988), enunciating the rule as being that "... a

---

The witnesses were a doctor who said the plaintiff could not return to his former occupation and a union representative and actuary who testified as to the loss of earning capacity. There is no

indication in the district court's opinion that it was not foreseeable at the time of the filing of the claim that the plaintiff would not be able to return to his former occupation.

reasonably based change in expectation as to the severity and permanence of an injury is newly discovered evidence within the meaning of section 2675(b)." *Id.,* citing *Fraysier.* In the *Cole* case, the plaintiff worked for the railroad. As of the time he had filed his administrative claim, he had been told that although he had "severe burns to his knee which resulted in blood clots," his doctors opined that he would be able to return to his regular employment. *Id.* It was only twenty-one months later that he was told that he had permanent thrombophlebitis and could not return to work. *Id.* The court held that the district court's finding that this was "newly discovered evidence" was "supported by the record" and a recovery in excess of the administrative claim was allowed. *Id.* at 1263.

Another court put it a bit differently stating that:

Only after extensive physical, psychological and psychiatric examination was it possible to determine the nature of the plaintiff's injuries. A rule that would require the plaintiff to know the full extent of his injuries when they are such that medical science cannot immediately establish them is neither logical nor practical.

*Joyce v. United States,* 329 F.Supp. 1242, 1247–48 (W.D.Pa., 1971), *vacated on other grounds,* 474 F.2d 215 (3 Cir., 1973).

To the same effect is the case of *Foskey v. United States,* 490 F.Supp. 1047, 1060–61 (D.R.I., 1979). In that case, the doctors opined that the child's condition would improve with treatment, and, in fact, it did improve with treatment. However, what ultimately occurred, "which was not reasonably discoverable or foreseeable" was that the child, as a result of the treatment, began to suffer a whole new series of seizures, and the treatment became "counterproductive and had to be abandoned." *Id.* at 1061. Any progress which had been made was lost, and ". . . further progress was not possible." *Id.* Consequently, the plaintiff was permitted to recover an amount in excess of that stated in the administrative claim.

In *Low v. United States,* 795 F.2d 466 (5 Cir., 1986), the Fifth Circuit refused to allow recovery in excess of the amount set forth on the administrative claim. Mrs. Low filed the administrative claim in February, 1983, alleging medical malpractice in connection with the birth of her son, Brian, at a Navy facility in 1981; the claim was for $1,275,000.00. *Id.* at 468. In her suit filed about ten months later, she sought $12,000,000.00. *Id.* At trial, Mrs. Low testified that the reason for the increase was ". . . because, at the time she filed tie administrative claim, 'we did not know what Brian would be able to do because the doctors were unable to tell us.'" *Id.* at 469. The district court allowed recovery in excess of the claim.

The Court of Appeals held first that the district court's finding that "the post-claim evidence of the extent of Brian's condition, the prospects for his recovery, and of his life expectancy could not be been discovered at the time Mrs. Low filed the administrative claim" was not clearly erroneous. *Low,* 795 F.2d at 470. However, the Court ruled that nonetheless, these facts did not constitute "newly discovered evidence" or "intervening facts." It wrote that in order to come within § 2675(b):

[S]everal requirements must be satisfied. First, the evidence must support the increase in the prayer over the administrative claim. 28 U.S.C. § 2675(b). Next, the allegedly newly discovered evidence or intervening facts must not have been reasonably capable of detection at the time the administrative claim was filed. *O'Rourke v. Eastern Air Lines, Inc.,* 730 F.2d 842, 856 (2 Cir., 1984); *Williams By Williams v. United States,* 608 F.Supp. 269, 273 (S.D.Fla., 1985). That is, while courts do not charge a claimant with knowing that [which] the physicians could not tell him, *Fraysier v. United States,* 766 F.2d 478, 481 (11th Cir., 1985), the information must not have been discoverable through the exercise of reasonable diligence.

*Low,* 795 F.2d at 471.

The Court, quoting from its earlier decision in *Martinez v. United States,* 780 F.2d 525, 530 (5 Cir., 1986), observed that § 2675(b) must be construed in accordance with the purpose of the section.

In *Martinez v. United States*, 780 F.2d 525, 530 (5th Cir.1986), we noted that "[t]he manifest purpose of the sum certain requirements of § 2675 is to ensure that federal agencies charged with making an initial attempt to settle tort claims against the United States are given full notice of the government's potential liability." Section 2675 should be interpreted so that "[t]he government will at all relevant times be aware of its maximum possible exposure and will be in a position to make intelligent settlement decisions." *Id.*

*Low,* 795 F.2d at 471.

Applying these principles to the facts, the Court ruled that the facts in *Low* did not permit a recovery over the administrative claim, writing that:

The evidence that the district court concluded was undiscoverable at the time the claim was filed addresses the precision with which the severity of Brian's condition could be known. The evidence does not alter the fact, however, that when the administrative claim was filed, Mrs. Low already knew that Brian had cerebral palsy, a seizure disorder, and was blind, deaf, and mentally retarded. There is no evidence that these conditions became worse or that other conditions developed after the claim was filed.

*Low,* 795 F.2d at 471.

Reiterating that the evidence went only to the precision of Brian's prognosis, the Court noted that:

[I]f the exact nature, extent and duration of each recognized disability must be known before § 2675(b) will be given effect, that section will be rendered useless, and the government will be unable to evaluate any claim made against it without the threat that, if it does not settle, its liability may increase substantially.

*Low,* 795 F.2d at 471.

### B. The First Circuit's Analysis in *Reilly v. United States*

█ In the *Reilly* case, 863 F.2d 149, the First Circuit followed the *Low* precedent. In *Reilly,* the district court found the government liable for the negligence of Navy doctors during the birth of Heather Reilly; the negligence caused her irremediable brain damage.

[S]he was left a "helpless individual, 'significantly delayed developmentally' and unable to see; she will never be able to walk, talk, feed or take case of her self in any way."

*Reilly,* 863 F.2d at 153 quoting from *Reilly v. United States,* 665 F.Supp. 976, 979 (D.R.I., 1987).

The administrative claim for $10,000,000.00 was filed in May, 1995, five months after Heather's birth; the district court awarded $11,037,964.00. *Reilly,* 863 F.2d at 171. The district court allowed increased damages because:

Only after May 1985 did it become medically apparent that Heather would never be able to walk or talk, and that she would be able to see only enough to distinguish light from dark.... Given the undisputed medical impossibility of knowing the extent of Heather's multiple disabilities at the time the administrative claim was filed, I find the experts' subsequent confirmation that the worse possibilities had materialized to constitute "newly discovered evidence not reasonably discoverable at the time of presenting the claim to the federal agency ...," 28 U.S.C. subsection 2675(b).

*Reilly,* 665 F.Supp. at 1011 quoted verbatim in *Reilly,* 863 F.2d at 171.

The Court of Appeals ruled that this was an insufficient basis for exceeding the amount of the administrative claim, describing the test as follows:

Because the statute itself renders the state of a claimant's knowledge (actual or constructive) at the time of presentment of the claim of discretionary significance, the mechanics of a § 2675(b) inquiry must be double-barreled: What should the party have known? When should she have known it? To be binding in this context, knowledge need not be certain. In the same vein, intelligence which serves only to bear out earlier suspicions cannot unlock the FTCA's narrow escape hatch. Diagnoses which are no more than cumulative and confirmatory of earlier diagnoses

are neither "newly discovered evidence" nor "intervening facts" for purposes of § 2675(b). *See Kielwien v. United States,* 540 F.2d 676, 680–81 (4th Cir.), *cert. denied,* 429 U.S. 979, 97 S.Ct. 491, 50 L.Ed.2d 588 (1976); *Powers v. United States,* 589 F.Supp. 1084, 1110 (D.Conn. 1984). We agree with the Second Circuit that the statute demands a showing that "some new and previously unforeseen information came to light" between the time of filing the administrative claim and the trial on damages. *O'Rourke v. Eastern Air Lines, Inc.,* 730 F.2d 842, 856 (2d Cir.1984). And, the newly-emergent datum must be material.

*Reilly,* 863 F.2d at 171.

Applying the test, the Court wrote:

On this occasion, the information was neither sufficiently new, nor sufficiently unforeseen, nor sufficiently material. By the time the claim was filed, the Reillys were on notice of the global extent of Heather's injuries and disabilities. The evidence upon which the district court relied to lift the cap was, at bottom, nothing more than "the experts' subsequent confirmation that the worst possibilities had materialized." *Reilly I,* 665 F.Supp. at 1011. Yet these very same "worst possibilities," *i.e.,* "that Heather would never be able to walk or talk, and that she would be able to see only enough to distinguish light, from dark," *id.,* were present from the start. Indeed, they were at the core of appellees administrative claim, which alleged "seizures, blindness, profound neurological deficit" and the like as the sequelae of the harm. The mere fact that these dread consequences, feared from the beginning, had become more certain does not suffice to brand them "newly discovered."

*Reilly,* 863 F.2d at 172.

Relying on the analysis of the Fifth Circuit in *Low v. United States,* 795 F.2d 466, the Court held:

[There] was more than enough [evidence] to put [the Reillys] on fair notice to guard against the worst-case scenario when preparing their claim. As in Low, the fact that the degree of disability was uncertain was, in and of itself, inadequate to trigger the exception to § 2675(b).

*Reilly,* 863 F.2d at 172–73.

The First Circuit found support for its construction of § 2675(b) in the purposes behind the statute's enactment.

The goal of the administrative claim requirement is to let the government know what it is likely up against: mandating that a claimant propound a definite monetary demand ensures that "[t]he government will at all relevant times be aware of the maximum possible exposure to liability and will be in a position to make intelligent settlement decisions." *Martinez v. United States,* 780 F.2d 525, 530 (5th Cir.1986); *see also,* S.Rep. No. 1327, 89th Cong., 2d Sess. 2, *reprinted in* 1966 U.S.Code Cong. & Admin.News 2515, 2516 (fundamental purpose of requiring an administrative claim is "to ease court congestion and avoid unnecessary litigation, while making it possible for the Government to expedite the fair settlement of tort claims asserted against the United States"). As between prospective defendant and prospective plaintiff, the latter is in by far the better position to determine the worst-case scenario, or, if uncertain, to paint the picture as bleakly as reason permits and conscience allows. If a plaintiff misjudges, as to matters known or easily deducible, when her claim is filed it seems more equitable for her to bear the burden of miscalculation than to impose it on the sovereign. *Cf. Lopez v. United States,* 758 F.2d 806, 809 (1st Cir., 1985) ("individuals wishing to sue the government must comply with the details of the [FTCA claim requirement]").

*Reilly,* 863 F.2d at 173.

Lastly, the Court distinguished some of the cases in which recovery in excess of the administrative claim had been allowed mainly on the ground that in those cases, the ultimate prognosis was not foreseeable when the administrative claim was filed.[31]

---

31. Specifically, the *Joyce* case, 329 F.Supp. 1242, was distinguished on the ground that in that case, the administrative claim was filed when the full diagnosis had not been made. The *Foskey* case, 490 F.Supp. 1047, was distinguished on the ground that the initial prognosis offered by the

## C. Court Decisions After the *Low* and *Reilly* Opinions

Interestingly, the Sixth Circuit Court of Appeals has found that the opinions in the *Low* and *O'Rourke* cases indicate that courts are now "... read[ing] the term 'intervening fact' more strictly to require that it be unexpected or unforeseen" and that in its view, "the stricter reading on 'intervening fact' in these cases is supported by considerations of policy and law." *Allgeier v. United States*, 909 F.2d 869, 878 (6 Cir., 1990). The facts of that case are that on March 6, 1984, Ms. Boldrick, a passenger in a private vehicle, was injured when a Postal Service truck forced the private vehicle "off a narrow rural road and into a tree." *Allgeier*, 909 F.2d at 871. An administrative claim for $50,000.00 was filed on February 13, 1986; the Court awarded $104,000.00 and denied a post-trial motion to reduce the award. *Allgeier*, 909 F.2d at 877. The injuries were to both of Ms. Boldrick's knees, and a year before she filed her claim, her doctor advised that both knees needed arthroscopic surgery. *Id.* at 878. However, she elected to have surgery only on the right knee, which was performed on April 2, 1985. *Id.* at 878.

Between the right knee surgery and the time the administrative claim was filed, her left knee improved. But the right knee deteriorated after the administrative claim was filed necessitating the second surgery. *Id.* at 878–79. The Court wrote that:

[B]ecause of the relative improvement in Boldrick's condition immediately before the administrative claim was filed and the significant worsening of her condition well over a year later, the need for the second operation and extensive additional treatment were not reasonably foreseeable at the time the administrative claim was filed.

*Allgeier*, 909 F.2d at 879.

In the case of *Michels v. United States*, 815 F.Supp. 1244 (S.D.Iowa, 1993), a magistrate judge was faced with a similar type of question. The claimant was severely injured when he was riding his motorcycle and was struck by a vehicle driven by an employee of the Department of Agriculture. *Id.* at 1246. He sought to increase the amount of his administrative claim based on the fact that he subsequently developed arthritis, had to undergo hip replacement surgery, and found that he could no longer engage in his traditional occupation as a farmer. *Michels*, 815 F.Supp. at 1263–65. The Court permitted the increase.

In so doing, the Court reviewed the precedent as it then existed and found "two divergent lines of authority with respect to modification of a claim for damages under the FTCA." *Id.* at 1260. The first line of authority, which was denoted the "Eleventh Circuit Approach," was to the effect that " 'a reasonably based change in expectation as to the severity and permanence of an injury is newly discovered evidence within the meaning of section 2675(b).' " *Id.* quoting from *Cole*, 861 F.2d at 1262. The *Fraysier, Husovsky, Molinar* and *Alexander* cases were seen as falling within this line.

The Court viewed the *Reilly* case, as well as the *Low* case, as being representative of the second line of authority "which strictly construes the requirements of 28 U.S.C. § 2675(b)," the "First Circuit Approach." *Michels*, 815 F.Supp. at 1261. Under this "approach":

... a claimant may not amend his or her claim for higher damages unless the claimant has new information which was not reasonably discoverable at the time the FTCA tort claim notice was filed and such information does not go to the severity of claimant's known injuries.

*Michels*, 815 F.Supp. at 1262.

The Court adopted the "Eleventh Circuit Approach" and entered judgment in an amount in excess of the administrative claim. *Id.* The Eighth Circuit affirmed. In a footnote, the Court stated that it did not agree with the district court that there were "... conflicting standards of law in the various circuits applying § 2675(b) ..."; rather, the

---

doctors was that the child's medical condition would improve; it unexpectedly did not. Lastly, the *Powers* case was distinguished on the ground of "substantial deterioration" of the claimant's health and the "unanticipated" needs created thereby. *Reilly*, 863 F.2d at 173 quoting from *Powers*, 589 F.Supp. at 1110.

Court wrote that it "perceive[d] little if any conflict among these cases, only different facts." *Michels v. United States*, 31 F.3d 686, 689, n. 2 (8 Cir., 1994). In discussing the *Reilly* case, the Eighth Circuit wrote:

> The government relies upon cases from other circuits holding that, when existing medical evidence and advice put the claimant "on fair notice to guard against the worst case scenario" in preparing the administrative claim, a § 2675(b) motion to increase that claim in litigation will be denied. *See Reilly v. United States*, 863 F.2d 149, 172 (1st Cir.1988). In our view, that is a proper interpretation of the phrase "not reasonably discoverable," and we agree with cases such as *Reilly*. But we also agree with the many decisions acknowledging that a known injury can worsen in ways not reasonably discoverable by the claimant and his or her treating physician, and holding that such "newly discovered evidence" or "intervening facts," if convincingly proved, can warrant § 2675(b) relief. *See Spivey v. United States*, 912 F.2d 80, 85–86 (4th Cir.1990) (if no symptoms exist when administrative claim is filed, known possible side effect that later develops can constitute newly discovered evidence); *Allgeier v. United States*, 909 F.2d 869, 879 (6th Cir.1990) (need for more knee surgery and additional treatment "not reasonably foreseeable" when administrative claim was filed); *Low v. United States*, 795 F.2d 466, 470 (5th Cir.1986) (summarizing prior cases).

*Michels*, 31 F.3d at 688–89.

In my view, while the difference between the approaches seems more than "different facts," I do not view the First Circuit's decision in *Reilly* as the district court did in *Michels* as precluding an increase whenever the new information goes "to the severity of claimant's known injuries." It is a matter of degree. As the Court phrased its holding in *Reilly*, the new

> ... information was neither **sufficiently** new, nor **sufficiently** unforeseen, nor **sufficiently** material [because] [b]y the time the claim was filed, the Reillys

were on notice of the global extent of Heather's injuries and disabilities.

*Reilly*, 863 F.2d at 172 (emphasis added).

The implication is that there may be complications from an injury which **are** sufficiently new and unforeseen and material to merit an increase in the amount sought in the administrative claim.

Courts in the First Circuit have applied *Reilly* in a variety of circumstances which exemplifies the difficulty in determining when complications are sufficiently new, unforeseen and material to warrant an increase. A claimant seeking to increase the ad damnum is not held to the standard of a "clairvoyant" in order to be entitled to an increase. *Poirier v. United States*, 745 F.Supp. 23, 32 (D.Me., 1990). But in *Wardwell v. United States*, 764 F.Supp. 679 (D.Me., 1991), the Court refused to allow an increase based on an assertion that:

> ... the treating orthopedic surgeon did not undertake an assessment of the permanent impairment she suffered as a result of the accident until after the filing of the administrative claim.

*Wardwell*, 764 F.Supp. at 684.

The Court wrote:

> The Court finds that this circumstance offers an excellent example of evidence which was reasonably discoverable; therefore, no increase in the administrative claims cap ... is warranted.

*Wardwell*, 764 F.Supp. at 684.

In *Myers v. United States*, 805 F.Supp. 90 (D.N.H., 1992), the claimant, injured in August, 1989, was diagnosed as suffering from two fractures (left patella and left tibia), and underwent arthroscopic surgery on his knee in December, 1989. The surgery confirmed the fractures and also revealed a partial tear of a ligament. *Id.* at 91. He was authorized to return to work in 1990. *Id.* The administrative claim was filed in February, 1991. In April, 1992, the doctor recommended "further reconstructive surgery to the left knee" caused by instability of the ligament secondary to the two fractures. *Id.* at 92.

The claimant argued that he "... could not have reasonably have foreseen the extent of

his injuries ...". *Id.* at 93. Relying on the *Reilly* case, the Court disagreed, writing:

> In the face of well-documented [ligament] damage, one surgery, and subsequent on-going knee problems, and while mindful of the consequences to plaintiff, the court is unable to say that [the claimants] need for additional surgery was unforeseeable. Thus, defendant herein cannot be made to bear the burden of plaintiff's failure to depict the worst-case scenario.

*Myers,* 805 F.Supp. at 93.

In my view, this result is directly at odds with the result which the Sixth Circuit reached in the *Allgeier* case and the magistrate judge reached in the *Michels* case. While I disagree with the magistrate judge's formulation of the First Circuit's holding in *Reilly* that an increase can never be allowed on the basis of new evidence as "... to the severity of claimant's known injuries," *Michels,* 815 F.Supp. at 1262, I do think that the First Circuit's approach differs substantially from that of other circuits, and I disagree with the Eighth Circuit's view that the differences are merely based on "different facts" present in the various cases. *Michels,* 31 F.3d at 689, n. 3. In my opinion, the First Circuit requires plaintiff to meet a higher threshold in proving that new information relating to a known injury or complications from a known injury is sufficiently new and unforeseen and material to merit an increase in the amount sought in the administrative claim. The threshold in other circuits is less.

## VI. APPLYING THE LAW TO THE FACTS OF MS. LOWRY'S CASE

 Summarizing the law in the First Circuit as I can best discern it, the following principles are applicable:

1. The burden of proving "newly discovered evidence" and/or "intervening facts" rests with the plaintiff.

2. The claimant is not required to be clairvoyant and is not to be charged with knowledge which neither the claimant nor medical professionals are able to discover.

3. However, the claimant is required to use due diligence to discover those facts which are capable of ascertainment prior to filing the claim.

4. Information which is confirmatory and/or cumulative of previous diagnoses is not a basis for an increase in damages.

5. Information going to the exact nature, extent and duration of a previous diagnosis is not a basis for an increase in damages.

6. Information which "... serves only to bear out earlier **suspicions**" does not entitle the plaintiff to an increase in damages. Neither does the doctors' later "confirmation that the worst **possibilities** had materialized." *Reilly,* 863 F.2d at 172. (emphasis supplied).

7. If there is evidence "to put [the claimant] on fair notice to guard against the worst-case scenario," the claimant has the obligation, before filing a claim, to "... determine the worst case scenario, or if uncertain, to paint the picture as bleakly as reason and conscience permits." *Id.* at 173.

8. If the claimant misjudges, the claimant, not the United States, bears the consequences. *Id.*

 Ms. Lowry's supplemental administrative claim for $600,000.00 was presented on September 24, 1990. She argues that the diagnosis of the low back disc herniation and the establishment of the permanent nature of her disability after that date constitutes either "intervening facts" or "newly discovered evidence."

With respect to the diagnosis of disc herniation at L4–L5, Lowry has failed to prove that this is "newly discovered evidence" or that the discovery is an "intervening fact." Lowry knew from the beginning that she had suffered some sort of injury to her lower back in the accident. Indeed, she complained of low back pain both in her initial Administrative Claim Form 95 and again in her supplemental administrative claim.[32] As of August, 1989, a CAT scan had revealed the bulging disc at L4–L5.[33] In his first report, dated January 30, 1990, Dr. Brick noted that

---

**32.** Exhibits A & B to # 14.

**33.** Trial Exhibit # 14c.

Lowry was experiencing back pain;[34] in his second report, dated August 21, 1990, he again stated that she had "low back pain, and remains unable to stand for more than an hour and a half at a time, as she remains disabled."[35]

In addition, there is considerable doubt as to whether the two diagnoses, reproduced at pages 707 and 708, *supra,* are different at all. At his deposition, which was shown at trial, Dr. Brick testified that the results of the MRI on the lumbar spine done in 1991 "... really confirmed the findings shown on the CAT scan previously."[36] When asked to distinguish between a "disc bulge" and "disc herniation," Dr. Brick testified that:

> They may be similar. A bulge, as I say, may be the stage before herniation. But it's often hard to differentiate between the two on X-rays. If you look at the progression of these problems, you begin with a bulge and end up with a herniation.[37]

Dr. Rosenthal testified in the same vein.

> Q. Am I correct that a herniation, the use of that term indicates a more significant injury? Is that also correct?
>
> A. It's basically on [sic] how the radiologist reads it. There's no way to detect whether something is a herniation unless you see a fragment out somewhere, as opposed to a protrusion. Because as I stated early on, a disk protrusion denotes that the annular fibers around the disk are intact. A disherniation that the annular fibers are broken and the internal material has extruded.
>
> \* \* \* \* \* \*
>
> Q. So you're saying that when the radiologist reports protrusion or herniation that that is not said with any certainty; that it's just use of the terms interchangeably, or not?

> A. That is used interchangeably because a herniation is a pathologic diagnosis which you're using X ray studies. You could take two radiologists and one could call something a protrusion, and the other guy could call it a herniation, and one guy could call it a bulge ...[38]

Dr. Rosenthal testified that there are tests to determine whether there is, in fact, a herniation, but neither of those tests were performed on Ms. Lowry.[39]

Although not mentioned in his original motion to increase the ad damnum, there was a difference between the (electromyography) studies done in 1989 and those done in 1991. On May 18, 1989, an "EMG of the right-sided paraspinal muscles [of the lower back] was normal."[40] On October 7, 1991, EMG tests revealed an "impression" of "L-5 radiculopathy-mild, right more prominently involved the left" with a comment that the "... patient demonstrates an abnormal electrodiagnostic test which demonstrates mild neurogenic findings in the L5 distribution indicating evidence of irritative radiculopathy ..."[41] Dr. Brick characterized this result as a "mild L-5 radiculopathy," the term "radiculopathy" meaning "evidence of pressure on a nerve ... [which] will cause some denervation or loss of nerve supply to the muscle."[42] Dr. Rosenthal opined that the change in the result was due to the fact that the continuing muscle spasms over time has "produced increasing disk [sic] pressures" which cause the discs to "become more degenerative in time" which, in turn, has "allowed the nerves to become involved more than previously ..."[43]

Significant for present purposes is that Dr. Brick saw Ms. Lowry on May 15, 1990 and then did not see her until April 16, 1992.[44] When confronted with the MRI and EMG

---

34. Exhibit C to # 14.

35. Exhibit D to # 14.

36. Trial Exhibit # 19 at pp. 51–52.

37. Trial Exhibit # 19 at p. 52.

38. Trial Exhibit # 20 at pp. 79–81.

39. Trial Exhibit # 20 at p. 80.

40. Trial Exhibit # 14c.

41. Trial Exhibit # 14k.

42. Trial Exhibit # 19 at p. 55.

43. Trial Exhibit # 20 at p. 76.

44. Trial Exhibit # 14b.

findings from 1991, he testified that they did not change either his diagnosis or prognosis which he had formulated as of May 15, 1990.[45] This was three months before the supplemental administrative claim for $600,-000.00 was filed.

On this record, I do not find that plaintiff has proven that the changed EMG readings are either "newly discovered evidence" or "intervening facts" which under First Circuit law would entitle the claimant to an increase over the amount of her administrative claim. There is no showing that they were unforeseeable; in fact, Dr. Brick implied that this was not an unusual progression.[46] In view of Dr. Brick's testimony that the differences in the results did not change either his diagnosis or prognosis, I find that the plaintiff has not demonstrated that the differences between the 1989 and 1991 EMG tests are sufficiently material to constitute either "newly discovered evidence" or "intervening facts."

Lastly, I do not find that fact in 1991 that Ms. Lowry was determined to have some degree of permanent disability constitutes grounds to increase the ad damnum. As of September 24, 1990, Ms. Lowry unquestionably knew that she was disabled and had been for almost two years. She applied for and received social security disability benefits effective March 1, 1989, in part "due to back problems."[47] Moreover, Dr. Brick stated in his first report that Lowry was "unable to return to work as an orthopedic nurse as this involves a lot of heavy lifting ... "[48] While it is true Dr. Brick originally opined that it was likely that Lowry would be able to return to work in an administrative capacity in three to six months, eight months later his opinion was much less optimistic. The likelihood of Ms. Lowry's being able to return to work changed to a possibility "in the future" that she would be able to return "to some occupation which would not involve heavy lifting."[49] The tenor of Dr. Brick's second report foreshadowed Dr. Rosenthal's final diagnosis of permanent disability.

As of September, 1990, Ms. Lowry knew that she could not return to work as an orthopedic nurse; she could not work as a staff nurse; she suffered chronic neck and low back pain, and she would need long-term physical therapy and continued medical treatment in the future. The handwriting of the potential worst-case scenario was on the wall by August of 1990. As in the *Reilly* case, there "... was more than enough [evidence] to put [her] on fair notice to guard against the worst case scenario when preparing [her] claim." *Reilly,* 863 F.2d at 173. "The fact that the degree of disability was uncertain was, in and of itself, inadequate to trigger the exception to § 2675(b)." *Reilly,* 863 F.2d at 172–173 citing *Low.*

### VII CONCLUSION AND ORDER

For all of the above-stated reasons, it is ORDERED that the Motion to Reconsider Motion to Amend Ad Damnum Clause (# 36) be, and the same hereby is, DENIED. The plaintiff's potential recovery in this case shall not exceed the $600,000.00 set forth in the supplemental administrative claim.

---

45. Trial Exhibit # 19 at pp. 58–59.

46. Trial Exhibit # 19 at p. 52.

47. Exhibit E to # 14.

48. Exhibit C to # 14.

49. Exhibit D to # 14.